Argued and submitted January 16, reversed and remanded May 30, 2001

## 1000 FRIENDS OF OREGON
## and Washington County Farm Bureau,
*Respondents - Cross-Petitioners,*

*v.*

## METRO,
*Respondent - Cross-Respondent,*
*and*

## RYLAND HOMES, INC.,
## and Springville Road Joint Venture,
*Petitioners - Cross-Respondents.*

2000-002; A111766

26 P3d 151

Jeff H. Bachrach argued the cause for petitioners - cross-respondents. With him on the briefs were Dana L. Krawczuk and Ramis Crew Corrigan & Bachrach.

Kenneth D. Helm argued the cause for respondent - cross-respondent. With him on the brief was Larry S. Shaw.

Mary Kyle McCurdy argued the cause and filed the brief for respondents - cross-petitioners.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

DEITS, C. J.

## DEITS, C. J.

Petitioners - cross-respondents, Ryland Homes, Inc., and Springville Road Joint Venture (Ryland Homes) seek review of LUBA's decision that remanded Metro's adoption of an ordinance amending the Metro Urban Growth Boundary (UGB) to include 109 acres of exclusive farm use (EFU) land located in northern Washington County. LUBA's remand to Metro was based on what it held to be deficiencies in Metro's application of factors 3 to 7, the locational factors of Goal 14.[1] Respondents - cross-petitioners, 1000 Friends of Oregon and the Washington County Farm Bureau (respondents) cross-petition, arguing that LUBA committed legal error in upholding certain portions of Metro's decision. In particular, respondents assert that Metro improperly relied on the 1997 Urban Growth Report (UGR) in determining the capacity of the UGB.

The property in dispute is part of a 488-acre area located in Urban Reserve Area (URA) 65. The specific property at issue here consists of 109 acres within URA 65 that is designated as Site 65. Site 65 is in the center of URA 65 and is zoned EFU. It is currently in agricultural use. The property is predominately made up of farm land consisting of Class II, III, and IV soils. Within URA 65, there is additional agricultural land, and there are two areas for which an exception to Statewide Planning Goal 3 has been taken. The purpose of

---

[1] Goal 14 provides, in part:

"Urban growth boundaries shall be established to identify and separate urbanizable land from rural land. Establishment and change of the boundaries shall be based upon considerations of the following factors:

"(1) Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

"(2) Need for housing, employment opportunities, and livability;

"(3) Orderly and economic provision for public facilities and services;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5) Environmental, energy, economic and social consequences;

"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7) Compatibility of the proposed urban uses with nearby agricultural activities."

Metro's expansion of the UGB at this location is to allow a residential development on Site 65. The concept plan adopted by Washington County for Site 65 provides for approximately 700 dwelling units.

As noted above, Ryland Homes's assignments of error concern LUBA's application of the locational considerations of Goal 14, factors 3 to 7. LUBA concluded that Metro's findings under Goal 14, factors 5, 6, and 7, were inadequate and remanded the case to Metro to address the specific inadequacies that it identified. Ryland Homes argues before us that LUBA erred in two respects in its holding that Metro did not properly address the Goal 14 locational factors. First, it contends that LUBA generally applied an incorrect legal standard. Second, it asserts that LUBA's specific assessment of the adequacy of Metro's application of factors 5, 6, and 7 was wrong.

Ryland Homes's argument concerning the general legal standard applied by LUBA is that "LUBA viewed each factor as an independent approval criterion that had to be satisfied based on its own specific findings and evidence." It is Ryland Homes's position that the proper standard of review for determining the adequacy of Metro's findings regarding factors 3 through 7 is whether the "totality of the findings demonstrate that each factor has been considered and balanced as part of the locational analysis." Ryland Homes contends that it is not always necessary that a local government make detailed findings for each of the Goal 14 factors. It argues that, in some instances, such as here, there is overlap among various factors and subfactors and that it is possible for a reviewing body, such as LUBA or this court, to determine that the local government has satisfied its obligation to consider and balance the locational factors by looking not just at the findings directed to each individual factor but at Metro's findings "as a whole."

■■ Ryland Homes is correct that the locational factors are not independent approval criteria. It is not necessary that a designated level of satisfaction of the objectives of each of the factors must always be met before a local government can justify a change in a UGB. Rather, the local government must show that the factors were "considered" and balanced

by the local government in determining if a change in the UGB for a particular area is justified. It is within a local government's authority to evaluate the Goal 14 factors and exercise its judgment as to which areas should be made available for growth. *Branscomb v. LCDC,* 64 Or App 738, 743, 669 P2d 1192 (1983), *aff'd* 297 Or 142, 681 P2d 124 (1984).

■ We agree with LUBA that Metro's failure to articulate its findings regarding each of the locational factors and its reasons explaining how it balanced the factors makes it impossible to conduct a meaningful review of Metro's decision. Contrary to Ryland Homes's assertion, however, LUBA did not treat the Goal 14 factors as independent approval criteria. Rather, LUBA found that because of Metro's failure to directly *address* certain aspects of factors 5, 6, and 7, it was not able to determine on review whether Metro had fulfilled its responsibility to consider and balance the locational factors of Goal 14. The requirement that each factor must be *addressed* does not make the factors independent approval criteria.

Ryland Homes, and perhaps Metro, seems to view the requirement that each of the factors be addressed as one of form over substance. As noted above, Ryland Homes asserts that, even if Metro did not address all of the factors, LUBA and this court can determine how Metro considered and balanced the factors by looking to other portions of Metro's decision and considering Metro's findings "as a whole." The first problem with Ryland Homes's position is that pertinent statutes and rules specifically require a local government to set forth findings of fact and statements of reasons when adopting or amending an urban growth boundary pursuant to Goal 14. ORS 197.732(4); OAR 660-004-0020(1) (Goal 2, Part II); OAR 660-004-0010(1)(b)(B).

■■ Further, we do not agree that attempting to divine Metro's unexpressed reasoning is an appropriate role for LUBA or this court on review. Our function as a reviewing body in this type of case is to review the local government's action under the scope of review articulated in ORS 197.850.[2]

---

[2] ORS 197.850(9) provides:

"The court may affirm, reverse or remand the order. The court shall reverse or remand the order only if it finds:

If the local government has not specifically articulated its findings regarding a particular factor and explained how it balanced that factor in making a decision regarding a change in a UGB, it is not properly within our scope of review to make assumptions and draw inferences from other portions of the local government's findings in order to surmise what the local government's decision really was. This is not a new standard. In 1977, the Oregon Supreme Court explained why it is necessary for government agencies to explain their decisions clearly and precisely in order to facilitate meaningful judicial review. The court stated:

> "We wish to make it clear that by insisting on adequate findings of fact we are not simply imposing legalistic notions of proper form, or setting an empty exercise for local governments to follow. No particular form is required, and no magic words need be employed. What is needed for adequate judicial review is a clear statement of what, specifically, the decisionmaking body believes, after hearing and considering all the evidence, to be the relevant and important facts upon which its decision is based. Conclusions are not sufficient." *Sunnyside Neighborhood v. Clackamas Co. Comm.*, 280 Or 3, 21, 569 P2d 1063 (1977); *see also Martin v. Board of Parole*, 327 Or 147, 157, 957 P2d 1210 (1998).

We hold that LUBA did not apply an incorrect legal standard in requiring that Metro adequately address each factor.

As noted above, Ryland Homes also disagrees with LUBA's holding that there were specific deficiencies in Metro's treatment of factors 5, 6, and 7. We will discuss LUBA's conclusions regarding each of the factors. Goal 14, factor 6, requires that changes in UGB boundaries be based on consideration of "[r]etention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority." *See also* Metro Code (MC) 3.01.020(b)(6).[3]

---

"(a) The order to be unlawful in substance or procedure, but error in procedure shall not be cause for reversal or remand unless the court shall find that substantial rights of the petitioner were prejudiced thereby;

"(b) The order to be unconstitutional; or

"(c) The order is not supported by substantial evidence in the whole record as to facts found by the board under ORS 197.835(2)."

[3] MC 3.01.020(b)(6) implements factor 6 of Goal 14. It provides:

Ryland Homes's first complaint regarding LUBA's assessment of Metro's factor 6 analysis is with LUBA's holding that Metro's findings under ORS 197.298 (statutory priority scheme for the inclusion of land in a UGB) did not constitute sufficient consideration of factor 6. Ryland Homes argues that the purposes of the priority scheme of ORS 197.298 and factor 6 are the same: to direct boundary expansions to exception lands and other land of less agricultural value unless there is a sufficient justification for doing otherwise. Ryland Homes points out that ORS 197.298 actually imposes a higher burden of proof than does factor 6 because, unlike the statute, factor 6 is not an approval criterion. It argues that, if the local government satisfies ORS 197.298, it must necessarily satisfy the requirement that it consider factor 6 of Goal 14 and balance it against the other Goal 14 factors.

---

"Factor 6: Retention of agricultural land. This factor shall be addressed through the following:

"(A) Prior to the designation of urban reserves, the following hierarchy shall be used for identifying priority sites for urban expansion to meet a demonstrated need for urban land:

"(i) Expansion on rural lands excepted from statewide planning Goals 3 and 4 in adopted and acknowledged county comprehensive plans. Small amounts of rural resource land adjacent to or surrounded by those 'exception lands' may be included with them to improve the efficiency of the boundary amendment. The smallest amount of resource land necessary to achieve improved efficiency shall be included;

"(ii) If there is not enough land as described in (i) above to meet demonstrated need, secondary or equivalent lands, as defined by the state, should be considered;

"(iii) If there is not enough land as described in either (i) or (ii) above, to meet demonstrated need, secondary agricultural resource lands, as defined by the state[,] should be considered;

"(iv) If there is not enough land as described in either (i), (ii) or (iii) above, to meet demonstrated need, primary forest resource lands, as defined by the state, should be considered;

"(v) If there is not enough land as described in either (i), (ii), (iii) or (iv) above, to meet demonstrated need, primary agricultural lands, as defined by the state, may be considered.

"(B) After urban reserves are designated and adopted, consideration of factor 6 shall be considered satisfied if the proposed amendment is wholly within an area designated as an urban reserve.

"(C) After urban reserves are designated and adopted, a proposed amendment for land not wholly within an urban reserve must also demonstrate that the need cannot be satisfied within urban reserves."

Ryland Homes is correct that a local government has considerable discretion in its application of factor 6, perhaps more than in the application of the approval criteria of ORS 197.298. Further, it is also true that there is a close relationship between the considerations under ORS 197.298 and factor 6. If the requirements of ORS 197.298 for the inclusion of land in the UGB are met, similar considerations may well be pertinent to the local government's findings relating to factor 6 and the subsequent balancing of factor 6 against the other locational factors of Goal 14.

■ However, the problem with Ryland Homes's assertion, as LUBA correctly explains, is that the requirements of ORS 197.298[4] and factor 6 are not identical. ORS 197.298

---

[4] ORS 197.298 provides:

"(1) In addition to any requirements established by rule addressing urbanization, land may not be included within an urban growth boundary except under the following priorities:

"(a) First priority is land that is designated urban reserve land under ORS 195.145, rule or metropolitan service district action plan.

"(b) If land under paragraph (a) of this subsection is inadequate to accommodate the amount of land needed, second priority is land adjacent to an urban growth boundary that is identified in an acknowledged comprehensive plan as an exception area or nonresource land. Second priority may include resource land that is completely surrounded by exception areas unless such resource land is high-value farmland as described in ORS 215.710.

"(c) If land under paragraphs (a) and (b) of this subsection is inadequate to accommodate the amount of land needed, third priority is land designated as marginal land pursuant to ORS 197.247 (1991 Edition).

"(d) If land under paragraphs (a) to (c) of this subsection is inadequate to accommodate the amount of land needed, fourth priority is land designated in an acknowledged comprehensive plan for agriculture or forestry, or both.

"(2) Higher priority shall be given to land of lower capability as measured by the capability classification system or by cubic foot site class, whichever is appropriate for the current use.

"(3) Land of lower priority under subsection (1) of this section may be included in an urban growth boundary if land of higher priority is found to be inadequate to accommodate the amount of land estimated in subsection (1) of this section for one or more the of the following reasons:

"(a) Specific types of identified land needs cannot be reasonably accommodated on higher priority lands;

"(b) Future urban services could not reasonably be provided to the higher priority lands due to topographical or other physical constraints; or

"(c) Maximum efficiency of land uses within a proposed urban growth boundary requires inclusion of lower priority lands in order to include or to provide services to higher priority lands."

requires that Metro evaluate potential expansion sites and assign them priority for inclusion in the UGB, with higher priority being given to land of lower soil capability. In addition, however, ORS 197.298(3) provides a mechanism for including lower priority land within a UGB under certain limited circumstances. Factor 6, on the other hand, has the single objective of retaining agricultural land, particularly land with a high agricultural suitability soil class. Factor 6, as implemented by MC 3.01.020(b)(6), does not incorporate the exceptions to the priority scheme of ORS 197.298 found in subsection (3) of that statute, nor does the code waive the obligation to consider retention of agricultural land as factor 6 requires. The portion of the Metro Code implementing factor 6 requires Metro to address the impact of expansion of the UGB at various locations on the retention of agricultural land. Because there are differences in the two standards, LUBA correctly concluded that Metro's application of the priority scheme of ORS 197.298 did not excuse it from its obligation to address factor 6 and to consider the objective of factor 6 to retain agricultural land. *Residents of Rosemont v. Metro,* 173 Or App 321, 332-33, 21 P3d 1108 (2001).

■ Ryland Homes also takes issue with LUBA's specific conclusion that it did not consider whether the other 120 acres of EFU-zoned lands within URA 65 could reasonably accommodate the proposed use. Ryland Homes asserts that Metro made findings in other portions of its decision that constituted adequate consideration of those other EFU-zoned lands. It contends that we can infer from Metro's general findings that the agricultural lands in URA 65, other than site 65, cannot accommodate the proposed use. Specifically, Ryland Homes points to Metro's conclusion that it is not feasible to develop any other part of URA 65 until urban services and facilities are first developed on Site 65. Ryland Homes urges us to consider an engineering study that assessed the feasibility of providing services to different areas of URA 65 and relates specifically to locational factors 3 and 4, not factor 6. Ryland Homes acknowledges that this evidence and Metro's findings regarding it relate generally to URA 65 and are not specifically directed to the agricultural lands issues that LUBA believed needed to be addressed under factor 6. However, it contends that, in view of this general information

indicating that the development of other parts of URA 65 is not feasible, LUBA's holding that Metro must adopt findings specifically directed to the agricultural lands imposes a superfluous requirement. For the reasons discussed above, we do not believe that LUBA erred in requiring that Metro include specific findings under factor 6 relating to this additional 120 acres of agricultural lands. When a relevant legal requirement calls for findings addressing a particular criterion, fulfilling that requirement is not a superfluous exercise.

■ Ryland Homes also argues that LUBA erred in holding that Metro's findings under factor 5 concerning the environmental, social, energy and economic (ESEE) consequences of expanding the UGB at Site 65 as compared to the impacts at alternative sites were deficient. *See also* MC 3.01.020(b)(5).[5] LUBA held:

"MC 3.01.020(b)(5) requires a comparison of the ESEE consequences between the proposed expansion area and other potential alternative sites, and that until Metro actually examines the ESEE consequences of expanding the UGB at those alternative sites, Metro is in no position to conclude that the ESEE consequences of urbanizing the proposed expansion area are not significantly more adverse than for alternative sites."

Ryland Homes argues that "the findings taken as a whole adequately explain why Metro determined, balancing all considerations and impacts," that expanding the UGB at

---

[5] MC 3.01.020(b)(5), which implements Goal 14, factor 5, provides:

"Factor 5: Environmental, energy, economic and social consequences. An evaluation of this factor shall be based upon consideration of at least the following:

"(A) If the subject property contains any resources or hazards subject to special protection identified in the local comprehensive plan and implemented by appropriate land use regulations, findings shall address how urbanization is likely to occur in a manner consistent with these regulations.

"(B) Complementary and adverse economic impacts shall be identified through review of a regional economic opportunity analysis, if one has been completed. If there is no regional economic opportunity analysis, one may be completed for the subject land.

"(C) The long-term environmental, energy, economic, and social consequences resulting from the use at the proposed site. Adverse impacts shall not be significantly more adverse than would typically result from the needed lands being located in other areas requiring an amendment of the UGB."

this location was a better alternative than expanding at other locations. Ryland Homes then points to certain evidence throughout the record and findings under portions of Metro's decision concerning other Goal 14 factors, as well as other portions of its decision, and contends that we should essentially put the pieces of the puzzle together and conclude that Metro did adequately address the ESEE consequences under factor 5. As discussed above, our function on review is to determine if LUBA has correctly assessed whether the local government has satisfied all applicable legal requirements in making its decision. Metro has an obligation to consider each of the locational factors and to articulate its thinking regarding the factor and the role that each factor played in its balancing of all of the factors. LUBA was correct that Metro's findings on factor 5 focus almost solely on Site 65. Any references to the impacts on alternative sites are conclusional in nature and simply do not allow meaningful review by this court or LUBA.

Ryland Homes also argues that, because Metro found that there were no significant adverse impacts that would result from the expansion of the UGB at Site 65, there is no need to consider the impacts of expansion at the alternative sites. Again, Metro seeks to take a shortcut and avoid having to articulate the steps that it has taken in its analysis of an ultimate conclusion regarding the locational factors of Goal 14. As discussed above, in order to carry out effectively the review that LUBA and this court must undertake, the steps required by the law must be taken and explained, even though, at times, those steps may seem to be formalistic.

■ Ryland Homes's final complaint is about LUBA's determination that Metro's consideration of factor 7 of Goal 14 was deficient. Factor 7 requires that the "compatibility of the proposed urban uses with nearby agricultural activities" be considered. *See* MC 3.01.020(b)(7).[6] LUBA concluded that

---

[6] MC 3.01.020(b)(7) provides:

"Factor 7: Compatibility of proposed urban development with nearby agricultural activities.

"The record shall include an analysis of the potential impact on nearby agricultural activities including the following:

"(i) A description of the number, location and types of agricultural activities occurring within one mile of the subject site;

Metro's consideration of this factor was deficient, because Metro did not compare the impacts of urbanizing Site 65 to the impacts of urbanizing alternative sites. Ryland Homes acknowledges that an alternative sites comparison was not undertaken with respect to factor 7, but it argues that such a comparison is not necessary because the proposed change in the UGB does not result in any adverse impacts on agricultural activities on Site 65. Ryland Homes reasons that, accordingly, it is unnecessary to consider the impacts on agricultural activities on alternative sites. We agree with LUBA's response to this argument. LUBA stated:

"We disagree with intervenors that no alternative sites comparison is required by Goal 14, factor 7. Metro's consideration and balancing of that factor would have little context or meaning if the only analysis was of the impacts of urbanizing the proposed expansion area and not alternative sites. It may be, as intervenors suggest, that in the present case that comparison would demonstrate only that urbanizing Site 65 is no more adverse to agricultural activities than urbanizing other sites within URSA 65. However, Metro's findings do not make that comparison, and we agree with petitioners that those findings are inadequate in that respect."

We now turn to the cross-petition. Cross-petitioners argue that LUBA erred in concluding that Metro did not violate Goal 2 and Goal 14 by relying on the 1997 Urban Growth Report (UGR) in its assessment of the capacity of the existing UGB and, consequently, the need to expand the UGB. The dispute before LUBA, and now this court, concerns which document Metro may use as establishing the current capacity of the existing Metro UGB for dwelling units through the year 2017 for purposes of deciding if an extension of the UGB is necessary. The 1997 UGR, on which Metro based its decision, establishes that capacity to be 217,430 dwelling units.[7]

"(ii) An analysis of the potential impacts, if any, on nearby agricultural activities taking place on lands designated for agricultural use in the applicable adopted county or city comprehensive plan, and mitigation efforts, if any impacts are identified. Impacts to be considered shall include consideration of land and water resources which may be critical to agricultural activities, consideration of the impact on the farming practices of urbanization of the subject land, as well as the impact on the local agricultural economy."

[7] In September, 1999, the Metro council accepted an update to the 1997 UGR. In that update, it concluded that, because of additional measures related to stream

The Urban Growth Management Functional Plan,[8] which cross-petitioners assert is the appropriate document, provides that the target capacity[9] of the existing Metro UGB for dwelling units is 243,993. Using the capacity estimates in the 1997 UGR, Metro determined that there is a need for 32,370 additional housing units beyond the existing UGB. If the target capacities from the functional plan are used, the need for expansion is significantly reduced. It appears to be undisputed that use of the capacity estimates in the 1997 UGR results in a difference in need for expansion of the UGB of approximately 4,000 acres.

A similar dispute was before this court in *D. S. Parklane Development, Inc. v. Metro (Parklane II)*, 165 Or App 1, 994 P2d 1205 (2000). We concluded in that case, based on the structure of Metro's planning documents at that time, that the target capacity from the functional plan, rather than the capacity estimates in the 1997 UGR, must be used for purposes of establishing urban reserves under OAR 660, Division 21. We explained:

"The objective of the goal is to make the planning process and planning documents the basis for all decisions and actions related to use of land. The draft report is not a plan or a planning document of the kind that Goal 2 contemplates. It is an informal study that, by its own terms, is not related to the designation of urban reserves and, by its own terms, is not even a final document for the purposes at which it is directed. Under Goal 2, the computation of need must be based upon the functional plan and/or Metro's other applicable planning documents. Metro may, of course,

---

protection and a recalculation of the buildable land supply inside the existing UGB, the current UGB has adequate capacity to the year 2017. As best we can tell from this record, although the 1999 update was "accepted" by Metro in November 1999, it has not been incorporated into the Regional Framework Plan or any other formal planning documents.

[8] In general terms, a functional plan addresses "areas and activities having significant impact upon the orderly and responsible development of the metropolitan area." ORS 268.390.

[9] The parties do not cite a definition of "target" capacities as the term appears in the UGM Functional Plan. From the record before us, we understand the term to refer to a capacity that each member government must attain. That is, if the member governments take the action required under Title 1 of the UGM Functional Plan, the listed target capacities will be achieved. Table 3.07-1 in Title 1 of the UGMFP lists those target capacities.

amend those documents in the manner prescribed by law, if it chooses, but it cannot simply subordinate them to an informal study that is concerned with a remotely related matter." *Parklane II*, 165 Or App at 22 (internal quotation marks and emphasis omitted).

Basically, the same issue was again presented to LUBA and this court in *Residents of Rosemont*, 173 Or App at 333. Both LUBA and this court again rejected the argument that the capacity estimates in the 1997 UGR could be used by Metro in assessing the need for expansion of the UGB. *Id.* at 334.

 The dispute as to which capacity numbers Metro could use was again presented to LUBA in this case. LUBA determined that the answer here was different, however, because the capacity estimates from the 1997 UGR had been incorporated into Metro's Regional Framework Plan (RFP)[10] and that change in the status of those numbers made a difference. LUBA explained:

> "In *Residents of Rosemont v. Metro*, [38 Or LUBA 199 (2000), *aff'd in part, rev'd & rem'd in part* 173 Or App, 21 P3d 1108 (2001)], we held that Metro erred in relying on the 1997 UGR as a basis for determining need for a 1998 UGB amendment in the Stafford area of the Metro region. We rejected the respondents' argument that Metro's adoption of the 1997 UGR and the close relationship between the 1997 UGR and Metro's efforts to comply with the statutory mandate to amend the UGB made that document a final 'planning document of the kind that Goal 2 contemplates.' *Id.* at [207]. Petitioners argue that we should reach the same conclusion in the present case.

> "Metro and intervenors (together, respondents) respond that Metro properly relied upon the 1997 UGR, for the same reasons we rejected in *Residents of Rosemont*. However, Metro and intervenors make an additional argument not advanced by the parties in that case. Respondents explain

---

[10] As LUBA explains, a regional framework plan is essentially a master plan that incorporates and coordinates Metro's "various functional plans." ORS 268.020(7) defines a regional framework plan as:

"the Metro regional framework plan defined in ORS 197.015 and any district ordinances that implement the plan."

that in December 1997 Metro adopted a Regional Framework Plan (RFP), which is essentially a master plan that incorporates and coordinates Metro's various functional plans, including the UGM Functional Plan. The RFP sets forth and adopts the same methodology for determining population forecasts and UGB capacity that was employed in the 1997 UGR. Further, the RFP includes Table 1.1, which replicates the results of the 1997 UGR. Table 1.1 depicts the demand for residential housing over the period 1994 to 2017, sets out the current capacity of the UGB, subtracts the latter from the former, and concludes, as the 1997 UGR does, that there is a need for an additional 32,370 dwelling units beyond the current UGB capacity. Metro and intervenors argue that Table 1.1 represents Metro's official estimate of demand and UGB capacity for purposes of considering future regional UGB amendments, and that Metro can rely on that estimate, because the RFP was adopted by ordinance and is a planning document coordinated and consistent with Metro's other planning documents.

"* * * * *

"We agree with respondents that the RFP is a 'planning document of the type contemplated by Goal 2,' and *Parklane II* is not an impediment to Metro's reliance on the capacity figures in the RFP, more specifically the conclusion that UGB 20-year capacity in 1997 was insufficient to meet the projected demand by some 32,370 housing units. As we understand the purpose and function of Table 1.1 and the target capacities in the UGM Functional Plan, those two sets of figures bear only a tangential relationship to each other. As Metro points out, the UGM Functional Plan sets *target* capacities for constituent jurisdictions, and does not purport to establish the actual capacity of the UGB for any purpose or at any given time. According to Metro, the UGM Functional Plan is not a determination of need for any purpose, and in fact does not contain or rely upon a population forecast or estimate of future demand for housing, one of the essential components for calculating need under Goal 14. *See* MC 3.07, Table 3.07-1. Finally, for the reasons expressed in *Parklane II*, we disagree with petitioners that Metro is required to use the 1999 update over the figures in the RFP.

"In sum, we agree with respondents that to the extent Metro based its Goal 14, factors 1 and 2 need determination on the regional deficiency of 32,370 dwelling units projected

in the 1997 UGR and the RFP, petitioners have not demonstrated that it erred in doing so."[11] (Emphasis in original.)

The critical question that we must resolve here is whether the incorporation of the 1997 UGR capacity numbers into the RFP allows Metro to use those numbers in assessing whether an expansion of the UGB is justified here.[12] We agree with LUBA that, generally, the RFP, which now incorporates both the functional plan and UGR Table 1, is a coordinated authoritative planning document that, under Goal 2, may serve as the basis of decisions related to the use of land. There is also no doubt, as we have previously held, that the functional plan is such a document.

The difficulty here is that, under Goal 2, Part I, planning documents and actions must be consistent.[13] In this

---

[11] LUBA also included the following footnote explaining its rejection of Metro's argument that Metro's adoption of the *methodology* used in the 1997 UGR justified its use of the 1997 UGR numbers. It explained:

"Metro's position on this point differs slightly from intervenors'. Metro's response brief emphasizes that it is the RFP's adoption of the *methodology* used in the 1997 UGR, not the RFP's adoption of the *conclusions* of the 1997 UGR, that is significant here. We understand Metro to argue that it can rely directly upon the conclusions in the 1997 UGR because that document uses the same methodology for calculating UGB capacity and need adopted in the RFP, and that it need not rely upon the conclusions regarding UGB capacity and need adopted in the RFP. To the extent that is Metro's position, we reject it. If Metro adopts an estimate of UGB capacity and need in a Goal 2-coordinated planning document, then subsequent Metro UGB decisions must be based on and consistent with that estimate. *Parklane II*, 165 Or App at 22. In any case, if Metro is correct that it can rely upon estimates of UGB capacity and need based on the *methodology* in the RFP, and need not rely upon the *conclusions* in the RFP, it would seem to follow that, as petitioners argue below, Metro must rely upon the most current application of that methodology, *i.e.*, the 1999 update to the UGR." (Emphasis in original.)

[12] Ryland Homes argues that it is unnecessary to address this question because LUBA determined that a subregional need for the expansion of the UGB at this location was established and that this determination has not been challenged on review. Accordingly, Ryland Homes reasons that it does not matter which numbers are used to estimate the current capacity of the regional UGB because, in any case, the subregional need justifies the expansion. We disagree. As LUBA explains, Metro properly made its assessment of the subregional need in the context of the regional need and, accordingly, subregional need must be considered *after* appropriate assessment of and consideration of regional need.

[13] Goal 2, Part I, provides, in pertinent part:

"All land use plans shall include identification of issues and problems, inventories and other factual information for each applicable statewide planning goal, evaluation of alternative courses of action and * * *. * * * ultimate

case, the UGB capacity numbers in the two documents are not the same, and nothing in these or any other planning documents indicates how those capacity determinations interrelate. Ryland Homes and Metro contend that there is nothing inconsistent between the two documents, because the two documents serve completely different functions. They assert that the target capacities in the functional plan are just that—targets—and that they are not intended to be the exclusive basis of specific implementation decisions. They contend that nothing in the statutes, Goal 2, or the functional plan requires that the functional plan and its target capacities be the exclusive means of determining the capacity of the existing UGB. In their view, the UGM Functional Plan does not include specific data necessary to assess accurately the actual capacity of a UGB, such as a population forecast, economic assumptions, or an inventory of buildable lands and, accordingly, the target capacities simply do not provide sufficient information on which to base decisions concerning the appropriate size of the UGB. Ryland Homes asserts that the RFP, specifically the 1997 UGR, provides the necessary information and, accordingly, that information must govern specific decisions regarding the UGB.

We begin our discussion by finding, based on the information before us, that there is an inconsistency between the 1997 UGR and the functional plan. We essentially agree with cross-petitioners' assertion that:

> "By relying on the lower capacity estimates of the UGR (or its methodology in the RFP) to add land to the UGB without amending the UGM Functional Plan to reflect those numbers, *Metro imposes an inconsistent planning requirement on local governments.* It tells local governments to prepare for one method of accommodating growth (*i.e.*, accommodate more employment and housing inside the existing UGB), while Metro relies on another method to manage the UGB (*i.e.*, add land to accommodate that same projected employment and housing). The two methods are in conflict. Providing additional land for the same projected

---

policy choices * * *. * * * *The plans shall be the basis for specific implementation measures. These measures shall be consistent with and adequate to carry out the plans.* Each plan and related implementation measure shall be coordinated with the plans of affected governmental units." (Emphasis added.)

population will decrease the likelihood that infill and redevelopment will occur inside the UGB, or that higher density housing inside the UGB will be sought after. This is the type of inconsistent, uncoordinated planning that Goal 2 is intended to prevent. *See City of Portland v. Washington County*, 27 Or LUBA 176, 183-86, 189, *aff'd* 131 Or App 630 (1994); *DLCD v. Clatsop County*, 14 Or LUBA 358, *aff'd* 80 Or App 152 (1991)." (Emphasis added.)

Ryland Homes and Metro are right that, *theoretically*, under the applicable statutes, the functional plan does not have to be the exclusive basis of decisions regarding proposed expansions of the UGB. In conducting our review of Metro's actions, however, we must rely on the text and context of the pertinent documents before us and the local government's findings and conclusions relating to the matter. Whether the standards and procedures delineated in the applicable documents allow for the most efficient, accurate, or "best" planning decisions as a matter of policy is not a matter within our proper scope of review.

The problem with Metro and Ryland Homes's position in this case is that, under the text and context of the functional plan, the "target capacities" are mandated requirements, and the role of the 1997 UGR in making decisions regarding the UGB is simply not addressed in any of the pertinent documents or in Metro's decision.[14] MC 3.07.010 sets out the purpose of the UGM Functional Plan and establishes the document as one that specifies requirements for cities and counties. It provides, in part:

"The purpose of this functional plan is to implement regional goals and objectives adopted by the Metro Council as the Regional Urban Growth Goals and Objectives (RUGGO), including the Metro 2040 Growth Concept and the Regional Framework Plan. The comprehensive plan changes and related actions, including implementing regulations, required by this functional plan as a component of the Regional Framework Plan, shall be complied with by

---

[14] As we have noted, we have before us the arguments of counsel about the significance and proper use of the plans and the UGR table. We do not have the benefit of a Metro decision that *explains how the documents interrelate or are to be used together*. So said, we must caution that, given the language in section 3.07 *et seq.*, we express no opinion as to whether Metro's ordinances permit UGB amendments based on figures other than the "target capacities" listed in Table 3.07-1.

cities and counties as required by Section 5 (e) (2) of the Metro Charter."

As noted earlier, and consistently with the policy stated above, MC 3.07.150 of the functional plan requires cities and counties to achieve the "target capacities" listed in Table 3.07. The text quite clearly states that those "target capacities" are not directory goals but are mandates to Metro's local governments. From the text of MC 3.07.120 and MC 3.07.150 in the UGM Functional Plan, it appears that those target capacities are mandatory densities. For example, at MC 3.07.150(D), Metro requires a local government with capacities less than those in the table to amend the comprehensive plans and implementing ordinances "to increase calculated capacities, as needed, to comply with the calculated capacities required in Table 3.07-1." Based on the text and context of the functional plan and the portions of Metro's ordinances before us, the target capacities represent Metro's assessment of the capacity of the UGB at the time of enactment of the functional plan.

■ In contrast to the specific language addressing the role of the functional plan, there is nothing in Metro's coordinated planning documents designating how the 1997 UGR, and presumably subsequent updates to this report, are to be used in the management of the UGB. Further, there is nothing explaining, with reference to controlling ordinance provisions, how the UGR numbers relate to the target capacities in the functional plan. The fact that the methodology for determining the appropriate update numbers is incorporated into the RFP does not justify the use of the 1997 numbers. As LUBA explained, if that were true, the 1999 update numbers would be applicable. Without some provision explaining how the update numbers affect the target capacities in the functional plan, or without an amendment to the target capacities, we are unable to conclude that it was appropriate for Metro to rely on the UGB capacity estimates from the 1997 UGR. LUBA erred in so concluding.

With respect to cross-petitioners' second and third assignment of error, we affirm LUBA's decision without discussion.

On cross-petition, reversed and remanded to Metro to redetermine target capacities in accordance with this opinion; otherwise affirmed on petition and cross-petition.