115 P.3d 960 (2005)
200 Or. App. 482
CITY OF SANDY, Petitioner below,
v.
METRO, Respondent below, and
Biles Family, LLC, and City of Wilsonville, Intervenor below.
City of Hillsboro, Petitioner, and
Robert Bailey and Patricia Bailey, Intervenors below,
v.
Metro, Respondent, and
1000 Friends of Oregon, Biles Family, LLC, and City of Wilsonville, Intervenors below.
Clackamas County, Petitioner below,
v.
Metro, Respondent below, and
1000 Friends of Oregon, Biles Family, LLC, and City of Wilsonville, Intervenors below.
2004-107, 2004-108, 2004-109; A127336.
Court of Appeals of Oregon.
Argued and Submitted March 15, 2005.
Decided July 6, 2005.
*961 Timothy J. Sercombe, Portland, argued the cause for petitioner. With him on the brief was Preston Gates & Ellis LLP.
Richard P. Benner argued the cause and filed the brief for respondent.
Paul J. Gilles filed the brief amicus curiae for Greater Hillsboro Area Chamber of Commerce, Westside Economic Alliance, Association of General Contractors  Oregon Columbia Chapter, Specht Development, Inc., and Urban Developers Coalition.
Thomas Sponsler, Gresham, Pamela J. Beery, Portland, and Beery, Elsner & Hammomd, LLP, and Alan Andrew Rappleyea, Hillsboro, Brenda L. Braden, Tualatin, and Danny R. Olsen, Hillsboro, jointly filed the *962 brief amicus curiae for League of Oregon Cities.
Before EDMONDS, Presiding Judge, and WOLLHEIM[*] and SCHUMAN, Judges.
EDMONDS, P.J.
Metro, a metropolitan service district encompassing land in Multnomah, Washington, and Clackamas counties including the city of Hillsboro, passed an ordinance amending several provisions of its code. The amendment, among other things, moved Hillsboro's urban growth boundaries and directed Hillsboro to examine its industrial zoning districts and amend them if necessary to conform to Metro's direction. Hillsboro challenged the ordinance before the Land Use Board of Appeals (LUBA), arguing that, in enacting the ordinance, Metro exceeded its constitutional, statutory, and charter authority. LUBA rejected Hillsboro's arguments, and Hillsboro seeks judicial review.[1] ORS 197.850. We affirm.

I. BACKGROUND
Because this case concerns the scope of Metro's authority, some background concerning the constitutional, statutory, and charter sources of that authority, as well as the relation of those sources to each other, will provide necessary context.
In 1969, the Legislative Assembly enacted "The Metropolitan Service District Act," subsequently codified as ORS chapter 268, in order to enable the creation of "multipurpose districts to provide public services in metropolitan areas." Or. Laws 1969, ch. 700, relating clause and § 1. Metro, then known as the Metropolitan Service District, was formed in 1970; it dealt primarily with the Portland Zoo and sewage. In 1977, the Legislative Assembly amended chapter 268. The amendments specified that, despite its generic references to "metropolitan areas," that term meant areas within the boundaries of Clackamas, Multnomah, and Washington counties. Or. Laws 1977, ch. 665, § 2(3). The amended legislation assigned Metro a variety of land use planning responsibilities, including adoption of district land use planning goals and coordination of existing comprehensive plans within the district. Id. at § 17, codified as ORS 268.380 (1977). The statute required Metro to adopt "functional plans" to deal with particular issues of district-wide impact, including air quality, water quality, and transportation. Or. Laws 1977, ch. 665, § 18(1) and (2), codified as ORS 268.390(1), (2) (1977).
For over a decade, Metro existed purely as a creature of the legislature. Then, in 1990, the state's voters passed a constitutional amendment allowing "any metropolitan service district" to adopt a charter enabling it to enact district legislation on matters of metropolitan concern. Or. Const, Art. XI, § 14(3), (6). Shortly thereafter, in 1992, Metro electors chose to avail themselves of Article XI, section 14; they adopted a charter and constituted Metro as a home rule district.
The charter required Metro to adopt a "Regional Framework Plan" (RFP) to address growth management and land use issues that, in the opinion of Metro's governing body, the council, would benefit from regional planning. Metro Charter, ch. II, § 5(2)(a), (b). The charter specified that the council "may adopt the regional framework plan in components." Id. "Functional plans" as described above  limited, issue-specific programs  are components of the RFP. Metro Code (MC) 3.07.010; 1000 Friends of Oregon v. Metro, 174 Or.App. 406, 423-24, 26 P.3d 151 (2001). The ordinance at issue in this case is part of such a functional plan, the Urban Growth Management Functional Plan.
Recognizing that Metro electors had "enacted a charter" and that there were "discrepancies and conflicts between [that charter *963 and] state law," the 1997 Legislative Assembly enacted a statute designed "to conform [Metro's organic statute,] chapter 268 and other state laws to the 1992 Metro Charter." Or. Laws 1997, ch. 833, § 2.
This historical and structural background puts in perspective the issue presented by the disputed Metro ordinance. In order to affirm LUBA and conclude that the ordinance is valid, we must first conclude that the ordinance is within the authority that Metro has given itself in its own charter; that the charter's grant of authority is itself within the charter power conferred on Metro by relevant provisions of the constitution and statutes, in particular by Article XI, section 14, ORS 268.380, and ORS 268.390 (reproduced below); and that those constitutional and statutory provisions do not themselves violate any provision of the constitution, in particular Article XI, section 2, which deprives the legislative assembly of authority to interfere with a city's ability to structure its own government. La Grande/Astoria v. PERB, 281 Or. 137, 576 P.2d 1204, adh'd to on reh'g, 284 Or. 173, 586 P.2d 765 (1978).

II. THE METRO ORDINANCE
As authorized by statute and by its charter, Metro has enacted an RFP, one component of which is a functional plan called the Urban Growth Management Functional Plan. ORS 197.633 requires periodic review of such plans by the Land Conservation and Development Commission (LCDC) in order to ensure compliance with statewide goals. In response to such a review, Metro passed an ordinance containing amendments to several provisions of its code. The dispute in this case focuses on several of those amendments. One of them designates a particular site (the Helvetia site) to be included within Hillsboro's urban growth boundary, despite the fact that Hillsboro preferred a different site (the Evergreen site). The remainder of the disputed amendments (the "Title 4" amendments) apply to Hillsboro's code. In LUBA's terms, those Title 4 amendments "have the effect of requiring that cities within Metro's jurisdiction take future action to amend their zoning ordinances and subdivision regulations to include specific limitations on certain lands that are planned for industrial and employment uses." In particular, the Title 4 amendments restrict office and other commercial uses of industrial land in order to keep that land available for industrial development, contrary to the preference of Hillsboro.
As noted above, Hillsboro challenged the amendments before LUBA; LUBA rejected the challenge, and Hillsboro renews its challenges on judicial review, making the same arguments that it made below.
Regarding the disputed change to Hillsboro's urban growth boundary, Hillsboro bases its argument on the contention that Metro had an obligation to exercise "coordinative functions," ORS 268.385(1), for "all planning activities affecting land uses within * * * Multnomah, Clackamas and Washington Counties," including activities instituted by cities, ORS 195.025(1). According to Hillsboro, this coordinative function requires Metro to "amend [Hillsboro's] urban growth boundary as requested by the City." LUBA correctly concluded that LCDC had exclusive jurisdiction over this issue because, in essence, it involved interpretation of Goal 2:
"Goal 2 requires that when Metro is adopting or amending its plans it must ensure that its new or amended plans are `coordinated with the plans of affected governmental units.' * * * Hillsboro points to nothing in the text of [ORS 268.385(1) or ORS 195.025(1)] that would support its contention that when Metro is coordinating under the statutes it is obligated to do more than coordination under Goal 2 requires."
We agree with LUBA and do not discuss this issue further.
The challenge to the Title 4 amendments is more complex. The amended ordinances to which Hillsboro objects are numbered Metro Code (MC) 3.07.420(A) to (F). Subparagraph (A) provides that "[e]ach city and county with land use planning authority over RSIAs [Regional Significant Industrial Areas] * * * [must] derive specific plan designation and zoning boundaries of RSIAs within its jurisdiction * * *." We presume that this subparagraph requires cities and counties *964 to identify RSIAs according to a Metro prepared map and to use that map in adopting their own regulations consistently with Metro's directives.
Subparagraph (B), perhaps the provision capturing the essence of Hillsboro's objection, requires that cities and counties amend their land use regulations to impose specific square footage limits on new retail development in RSIAs.
"Cities and counties shall review their land use regulations and revise them, if necessary, to include measures to limit the size and location of new buildings for retail commercial uses  such as stores and restaurants  and retail and professional services that cater to daily customers  such as financial, insurance, real estate, legal, medical and dental offices  to ensure that they serve primarily the needs of workers in the area. One such measure shall be that new buildings for stores, branches, agencies or other outlets for these retail uses and services shall not occupy more than 3,000 square feet of sales or service area in a single outlet, or multiple outlets that occupy more than 20,000 square feet of sales or service area in a single building or in multiple buildings that are part of the same development project[.]"
Subparagraph (C) requires cities and counties to amend their land use regulations so as to prevent approval of nonindustrial uses in RSIAs if approval will overload or degrade roads. Subparagraph (D) prohibits new nonindustrial uses. Subparagraph (E) imposes various specific requirements when lots of more than 50 acres in RSIAs are subdivided. Subparagraph (F) imposes specific limitations on expanding nonconforming, nonindustrial uses in RSIAs.
In sum, the amendments limit large retail, commercial, and medical facilities, limit the size of other nonindustrial uses, and allow division of large parcels only for uses compatible with large-parcel industrial developments. The purpose of the amendments, according to Metro, is
"[t]o improve the region's economic climate * * * by limiting the types and scale of non-industrial uses in Regionally Significant Industrial Areas * * *. Title 4 also seeks to provide the benefits of `clustering' to those industries that operate more productively and efficiently in proximity to one another than in dispersed locations. Title 4 further seeks to protect the capacity and efficiency of the region's transportation system * * *."
MC 3.07.410.

III. METRO'S AUTHORITY UNDER CHARTER, STATUTE, AND CONSTITUTION

A. Metro's charter and constitutional authority do not add to or subtract from Metro's statutory authority.

We agree with the parties that the pivotal provisions of the Metro Charter are Chapter II, sections 5(2)(e) and 9. The former provides:
"To the maximum extent allowed by law, the council shall adopt ordinances: (1) requiring local comprehensive plans and implementing regulations to comply with the regional framework plan within three years after adoption of the entire regional framework plan. * * * (2) requiring the council to adjudicate and determine the consistency of local comprehensive plans with the regional framework plan; (3) requiring each city and county within the jurisdiction of Metro to make local land use decisions consistent with the regional framework plan until its comprehensive plan has been determined to be consistent with the regional framework plan * * *; and (4) allowing the council to require changes in local land use standards and procedures if the council determines changes are necessary to remedy a pattern or practice of decision making inconsistent with the regional framework plan."
Section 9 of Chapter II provides:
"When carrying out the functions authorized or assumed under this charter: (1) Metro has all powers that the laws of the United States and this state now or in the future could allow Metro just as if this charter specifically set out each of those powers; (2) the powers specified in this charter are not exclusive; (3) any specification of power in this charter is not intended *965 to limit authority; and (4) the powers specified in this charter shall be construed liberally."
Because these provisions confer on Metro the authority to adopt, in essence, any ordinance that is authorized by law; because, as noted, ORS chapter 268 in general and ORS 268.380 and ORS 268.390 in particular were amended into their present form in order to make them conform to the Metro charter; and because, in fact, the provisions of Metro Charter, Chapter II, section 5(2)(e) are repeated almost verbatim in ORS 268.390(5), we conclude that the question whether the Metro council was authorized by charter to enact the ordinances at issue does not differ from the question whether Metro had that authority by statute. In other words, the charter grants authority coextensive with that which is granted by statute and the constitution.
Likewise, the constitution authorizes Metro to "provide for the exercise by ordinance of powers granted to the district by [other provisions of] the Constitution or laws of this state." Or. Const, Art. XI, § 14(3). No other provisions of the constitution confer relevant powers on Metro.[2] Therefore, the question of Metro's constitutional authority, like the question of its charter authority, reduces to the question of its authority granted by "laws," that is, by statute. In short, the question of Metro's authority is a question of statutory interpretation.

B. Metro's statutory authority

Generally, Metro has "full power to carry out the objectives of its formation and the functions authorized pursuant to its charter," ORS 268.300(1); it has the authority to "[e]xercise jurisdiction over * * * matters of metropolitan concern," ORS 268.310(6); and it may "[a]dopt land-use planning goals and objectives for the district consistent with [state-wide goals]," ORS 268.380. In particular, as set forth in ORS 268.390,
"(1) A district may define and apply a planning procedure which identifies and designates areas and activities having significant impact upon the orderly and responsible development of the metropolitan area, including, but not limited to, impact on:
"(a) Air quality;
"(b) Water quality; and
"(c) Transportation.
"(2) A district may prepare and adopt functional plans for those areas designated under subsection (1) of this section to control metropolitan area impact on air and water quality, transportation and other aspects of metropolitan area development the district may identify.
"(3) A district shall adopt an urban growth boundary for the district in compliance with applicable [state-wide land use planning goals].
"(4) A district may review the comprehensive plans in effect on January 1, 1979, or subsequently adopted by the cities and counties within the district which affect areas designated by the district under subsection (1) of this section or the urban growth boundary adopted under subsection (3) of this section and recommend or require cities and counties, as it considers necessary, to make changes in any plan to assure that the plan and any actions taken under it conform to the district's functional plans adopted under subsection (2) of this section and its urban growth boundary adopted under subsection (3) of this section.
"(5) Pursuant to a regional framework plan, a district may adopt implementing ordinances that:
"(a) Require local comprehensive plans and implementing regulations to comply with the regional framework plan within two years after compliance acknowledgment.
"(b) Require adjudication and determination by the district of the consistency of local comprehensive plans with the regional framework plan.
"(c) Require each city and county within the jurisdiction of the district and making land use decisions concerning lands within the land use jurisdiction of the *966 district to make those decisions consistent with the regional framework plan. * * *
"(d) Require changes in local land use standards and procedures if the district determines that changes are necessary to remedy a pattern or practice of decision-making inconsistent with the regional framework plan."
(Emphasis added.)
The language of these statutes is not ambiguous. ORS 268.310(6) gives Metro authority over "matters of metropolitan concern." Whether the Metro region contains sufficient land for industrial development is clearly such a concern, and petitioners do not contend otherwise. More specifically, ORS 268.390(4) gives Metro authority to require a city to change its plan to ensure that the plan "and any actions taken under it" conform to Metro's functional plans. Hillsboro contends that, by specifying that Metro's authority to require changes applies to a city's "plan," the provision, by negative implication, means that Metro lacks authority to require changes to particular parts of a plan. That contention cannot easily be squared with the language of the provision, which permits Metro to make changes to a plan so as to conform the plan and any actions taken under it to Metro's functional plans.
And even if Hillsboro's reading of subsection (4) is plausible enough to make that subparagraph, in isolation, ambiguous, the ambiguity does not survive consideration of subsections (5)(a) and (c). Those provisions give Metro authority to adopt ordinances that "[r]equire" local plans, "implementing regulations," and "land use decisions" to comply with Metro's RFP. The disputed Metro ordinances were adopted to ensure compliance with its RFP, and those ordinances require Hillsboro to amend zoning ordinances, which are land use "implementing regulations." ORS 197.015(11). Thus, ORS 268.390(5)(a) and (c) explicitly and directly authorize Metro to enact ordinances requiring Hillsboro to enact zoning ordinances that comply with Metro's RFP.
Hillsboro does not base its argument on a competing textual interpretation of ORS 286.380 and ORS 286.390. Rather, its arguments are contextual, oblique, and inferential. It contends, for example, that the ordinances in Title 4 are so detailed and particularized that, in essence, they transform Metro's RFP into a comprehensive plan, contrary to ORS 197.015(16). That statute, however, provides only that "[n]either the regional framework plan nor its individual components constitute a comprehensive plan." Id. Hillsboro's argument mistakes a descriptive statute for a prescriptive one; nothing in ORS 197.015(16) can plausibly be read to prohibit an RFP from performing some of the same functions as a comprehensive plan.
Likewise, Hillsboro argues that the Metro Charter is a "special powers" charter, that is, one under which the chartered governmental entity may exercise only specifically enumerated powers, as opposed to a "general powers" charter, under which the entity assumes all power that could be conferred by state law. Therefore, Hillsboro reasons, because ORS 268.310 gives Metro the power to carry out the objectives and functions set forth in its charter, Metro's organic statute must also envision a "special powers" entity. It therefore follows, according to Hillsboro, that, because Metro is authorized to propose model terminology and standards for zoning laws, by negative implication it does not have authority to impose specific zoning laws. Because Metro can "require changes in local land use standards" if necessary to remedy a "pattern or practice" of local decision-making that is inconsistent with a RFP, ORS 268.390(5)(d), by negative implication it cannot require changes in other circumstances.
These arguments fail because the premise underlying them is not accurate; regardless of what the founders of Metro may have thought they were creating, what they created in fact cannot be characterized as a "special powers" district. Indeed, it is difficult to imagine a charter that is less "special." As noted, the charter states:
"When carrying out the functions authorized or assumed under this charter: (1) Metro has all powers that the laws of the United States and this state now or in the future could allow Metro just as if this charter specifically set out each of those powers; (2) the powers specified in this *967 charter are not exclusive; (3) any specification of power in this charter is not intended to limit authority; and (4) the powers specified in this charter shall be construed liberally."
Metro Charter, ch. 2, § 9.
A similar argument, equally unpersuasive, is that the ordinances in Title 4 are preempted by state laws empowering cities such as Hillsboro to enact a comprehensive plan, ORS 197.175(2), and to exercise zoning authority, ORS 227.090. Because the ordinances permit Metro to perform the same functions that the statutes allocate to cities, Hillsboro contends, the ordinances must give way. The flaw in this logic is apparent. Metro's ordinances themselves are authorized by statute. Thus, Metro's ordinance creating a plan or imposing a zoning regulation that conflicts with a city's plan or regulation, pursuant to ORS 268.390(5), cannot be preempted by Hillsboro's statutory authority to perform the same functions. Both Metro and Hillsboro derive their authority from statute, but the statute authorizing Metro's authority explicitly states that Metro has the authority to bring cities like Hillsboro into compliance.
In sum, we conclude that, under its own charter, the constitution, and ORS chapter 268, Metro has the authority to enact the disputed ordinance as part of its RFP, even when that ordinance imposes requirements on Hillsboro that Hillsboro would not choose for itself. The constitution delegates authority to the legislature to enact legislation. That legislation, particularly ORS 268.380 and ORS 268.390, unambiguously confers authority on Metro to enact ordinances that require Hillsboro to enact ordinances bringing its land use regulations into conformity with Metro's, Hillsboro's oblique and inferential arguments to the contrary notwithstanding.

IV. CONSTITUTIONAL LIMITATIONS ON THE LEGISLATURE'S AUTHORITY TO EMPOWER METRO
We have concluded above that the Metro ordinance amendments are authorized by Metro's charter; the charter is authorized by statute; and the statute is authorized by Article XI, section 14, of the Oregon Constitution. That conclusion, however, does not end our inquiry. When a challenge to a state statute under home rule provisions is made, the court's decision must be derived from a standard arising from the constitution itself and not from the court's own view of competing public policies that find their origin outside the language of the constitution. LaGrande/Astoria, 281 Or. at 147, 576 P.2d 1204. According to the Oregon Supreme Court, the appropriate analysis for interpreting provisions of the Oregon Constitution is to understand the wording in light of the way the wording would have been understood and used by those who created the provision and then to apply those principles as understood to modern circumstances as they arise. State v. Rogers, 330 Or. 282, 297, 4 P.3d 1261 (2000).
Under those standards, Hillsboro argues that Metro's ordinance amendments violate Article IV, section 1(5), and Article XI, section 2, of the Oregon Constitution. Section 1(5) of Article IV provides in relevant part:
"The initiative and referendum powers reserved to the people by subsections (2) and (3) of this section are further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district."
Section 2 of Article XI provides, in relevant part,
"The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon[.]"
The language of Article XI, section 2, resolves the issue framed by Hillsboro's argument. The home rule authority granted to Hillsboro is subject to the other provisions of the Oregon Constitution, including the plenary authority granted by the constitution to the state legislature. That authority has been described as follows:
"[A] general law addressed primarily to substantive social, economic or other regulatory *968 objectives of the state prevails over contrary policies preferred by some local governments * * * unless the law is shown to be irreconcilable with the local community's freedom to choose its own political form. In that case, such a state law must yield in those particulars necessary to preserve that freedom of local organization."
LaGrande/Astoria, 281 Or. at 156, 576 P.2d 1204 (footnote omitted).
A similar principle is in play here. The formation of Metro and its exercise of regulatory power are authorized by the constitution itself. In the exercise of its plenary authority under the constitution, the legislature enacted statutes that grant authority to Metro to coordinate existing comprehensive plans within the district and to assign responsibilities regarding issues of district-wide impact. Pursuant to that constitutional and statutory authority, Metro directed the Hillsboro City Council to examine its industrial zoning districts and amend them if necessary to conform to Metro's direction. Because the constitution contemplates the exercise of regulatory power by Metro district-wide and because the grant of authority to home rule cities in the constitution is a limited grant of authority subject to other provisions of the constitution, Hillsboro's authority to determine the location of industrial zones and to enact enabling legislation must yield to the legislature's plenary authority derived from the constitution itself. Said otherwise, the exercise of such authority by the legislature is not irreconcilable with Hillsboro's freedom to chose its own political form because of Metro's district-wide regulatory objectives.
Affirmed.
SCHUMAN, J., concurring.
SCHUMAN, J., concurring.
I agree with all of the majority's analysis in Parts I through III and with the home rule analysis in Part IV as far as it goes. I write separately only to add the following thoughts to that last part.
An enactment that falls within the sphere of a governmental unit's subject matter authority must not only trace that authority to a constitutional grant; it must also avoid violating a constitutional limitation. For example, a Metro ordinance requiring homes owned by women to have 30-foot setbacks but not imposing a similar restriction on homes owned by men would be a regulation that falls within the sphere of Metro's subject matter authority  land use regulation  but it would nonetheless violate Article I, section 20, a provision that imposes limitations on governmental authority to distribute privileges on the basis of gender, regardless of whether the authority is exercised with respect to land use, pension benefits, or salary.[1] Hillsboro contends that, even if Metro has the authority to impose specific land use regulations on cities, the ordinance amendments doing so are unconstitutional nonetheless because they run afoul of a different, limiting provision of the Oregon Constitution: Article XI, section 2, in particular the sentence stating, "The Legislative Assembly shall not enact, amend or repeal any charter * * * for any municipality, city, or town."
As construed in La Grande/Astoria v. PERB, 281 Or. 137, 156, 576 P.2d 1204, adh'd to on reh'g, 284 Or. 173, 586 P.2d 765 (1978), that sentence prohibits the legislature from enacting a statute that "is irreconcilable with the local community's freedom to choose its own political form." Hillsboro argues that, to the extent that ORS chapter 268 authorizes Metro to dictate the contents of an ordinance and require Hillsboro to enact it, those provisions deprive Hillsboro of its freedom to choose its own political form. The electors of Hillsboro have enacted a charter under which they have chosen to govern themselves through a city council. They have not chosen to govern themselves through an altogether different legislative forum, the Metro council.[2]
*969 I find Hillsboro's argument to be unpersuasive. Under the Oregon Constitution, the Legislative Assembly has plenary authority to supersede home rule cities in matters of "substantive social, economic, or other regulatory policy." Id. The state's authority to impose land use regulations cannot be disputed, even when those regulations run counter to the preferences of cities or counties. By the same token, the legislature can delegate this superseding authority to its own creations such as state agencies. The delegation to Metro is no different. Thus, Hillsboro's argument reduces to an assertion that, even if the state can give Metro authority directly to impose specific zoning ordinances within Hillsboro, it cannot give Metro authority to do so indirectly by compelling Hillsboro to do the state's will. As Hillsboro puts it,
"[i]f authorized, Metro could possibly regulate industrial locations through its own ordinances. And it can undoubtedly enact standards to apply by the Hillsboro City Council in the enactment of city legislation. But the Metro Council cannot direct the City's legislative body to adopt particular detailed zoning law and apply that zoning without transgressing the City's charter organization of its own government."
This argument appears to elevate form over substance. If the state or its creatures such as Metro do not trench on Hillsboro's ability to choose its own political form by enacting legislation directly imposing a land use regulation on Hillsboro, why can they not enact legislation compelling Hillsboro itself to enact the legislation?
One answer to this question is suggested by United States Supreme Court cases examining the limits of congressional authority. In New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), the Court struck down a provision that would have compelled states either to take title to untreated radioactive waste produced within the state or to enact legislation to regulate that waste. The Court concluded that, although Congress could preempt state authority by directly imposing regulations, and it could provide incentives and disincentives designed to persuade the state to enact regulations, it could not indirectly impose its will on a state by requiring the state to legislate. Id. at 188, 112 S.Ct. 2408. Doing so would amount to "`commandeer[ing] the legislative process of the States by directly compelling them to enact and enforce a federal regulatory program.' "Id. at 161, 112 S.Ct. 2408 (quoting Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)). Reviewing constitutional history, the Court emphasized that the Framers, having witnessed the failure of the Articles of Confederation, explicitly and consciously decided that the federal government would regulate individuals and not states. Id. at 166, 112 S.Ct. 2408. A corollary of that decision, also forged in debate at the Constitutional Convention, was that Congress could not "employ state governments as [federal] regulatory agencies." Id. at 163, 112 S.Ct. 2408; accord Printz v. United States, 521 U.S. 898, 925-28, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (Congress cannot require local executive officials to implement federal law). Such compulsory legislation, the Court concluded, would offend the fundamental concept of state sovereignty incorporated into the federal system. Thus, if we were to apply the United States Supreme Court's federalism jurisprudence to this home rule issue, we would find Hillsboro's argument compelling.
To do so, however, would be inappropriate. As the cases cited above explain, the reason that Congress cannot command states to legislate, even when it can accomplish the identical result by legislating itself, has everything to do with political dignity and symbolism and nothing to do with power or practice. The reason derives from the text and history of the United States Constitution, under which states retain a special and protected status. The same cannot be *970 said for cities under the Oregon Constitution.
In the federal system, for example, states preexisted the nation; the nation began as a confederation of sovereignties. Thus, the term "state sovereignty" continues to have currency. Oregon, on the other hand, was never a confederation of cities; indeed, for the first 47 years of the state's existence, until the home rule amendments were adopted in 1906, cities had no independent legislative power. It is not an accident of language that the legal term for city authority is "home rule," with its connotations of parochialism, and not "city sovereignty." No one runs for office in Oregon on the platform of Cities' Rights.
Further, within the federal system, states exercise plenary authority while the federal government is limited to the exercise of enumerated powers. With cities and states, the relationships are reversed: The state has presumptive and plenary authority in matters of "substantive social, economic, or other regulatory policy," LaGrande/Astoria, 281 Or. at 156, 576 P.2d 1204, including land use regulation, and to the extent that cities have independent authority, it is conferred on them by the state charter. Or. Const., Art. IV, § 1(5); Or. Const., Art. XI, § 2. In other words, although the United States Constitution specifies that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," U.S. Const., Amend. X, no comparable text in the Oregon Constitution reserves to cities the residuum of unenumerated powers.
In short, states have a role in the history and structure of the federal system and in the text of the federal constitution that confers on them a dignitary interest and symbolic value such that Congress, when it wants to impose its will on them, cannot do so in an offensive manner. Cities do not play a comparable role in the history or structure of Oregon nor in the text of its constitution. I therefore perceive no reason why Metro, acting under its constitutional, statutory, and charter authority, cannot require Hillsboro to enact legislation that Metro itself could enact if it so desired. The disputed ordinance amendments are such legislation and, in enacting them, Metro does not dictate to Hillsboro the form of its political organization.
NOTES
[*] Wollheim, J., vice Richardson, S.J.
[1] Before LUBA, the petitioners were the cities of Sandy and Hillsboro. Biles Family, LLC, Robert Bailey, Patricia Bailey, and 1000 Friends of Oregon were intervenors. On judicial review, Hillsboro is the sole petitioner and Metro the sole respondent. Two briefs amicus curiae were filed in support of Hillsboro, one from the League of Oregon Cities and one from a group consisting of the Greater Hillsboro Chamber of Commerce, the Westside Economic Alliance, the Association of General Contractors  Oregon Columbia Chapter, the Specht Development, Inc., and the Urban Developers Coalition.
[2] Article IV, section 1(5), gives initiative and referendum powers to the voters of districts. The ordinances at issue in this case were not enacted in the exercise of those powers.
[1] By analogy, an act of Congress regulating the interstate shipment of newspapers endorsing Democrats would fall within the authorization contained in the Commerce Clause, U.S. Const., Art. I, § 8, but would nonetheless be unconstitutional for running afoul of the First Amendment.
[2] I note that, of the challenged amendments, only one, MC 3.07.420(B), quoted by the majority, 200 Or.App. at ___, 115 P.3d at 964, actually requires Hillsboro (and other cities within Metro) to adopt specified provisions. MC 3.07.420(B) declares that cities "shall review their land use regulations and revise them, if necessary, to include measures to limit the size and location of new buildings * * *. One such measure shall be that [certain named types of new buildings] shall not occupy more than" specified numbers of square feet. (Emphasis added.)