Argued and submitted October 12, 2000, affirmed on petition; reversed and remanded for further proceedings on cross-petition April 4, 2001

## RESIDENTS OF ROSEMONT
and David T. Adams,
*Respondents,*

*v.*

## METRO,
*Respondent,*

*and*

## ROSEMONT PROPERTY OWNERS ASSOC.,
Olive Kuhl, and Judy Eiselius,
*Petitioners,*

*and*

## Larry PETERSEN
and Homebuilders Association of Metropolitan Portland,
*Respondents.*

## CITY OF LAKE OSWEGO
and City of West Linn,
*Respondents - Cross-Petitioners,*

*and*

## LAKE OSWEGO SCHOOL DISTRICT NO. 7J,
West Linn-Wilsonville School District 3JT,
City of Tualatin, and Clackamas County,
*Respondents,*

*v.*

## METRO,
*Respondent - Cross-Respondent,*

*and*

## ROSEMONT PROPERTY OWNERS ASSOCIATION,
Olive Kuhl, and Judy Eiselius,
*Petitioners - Cross-Respondents,*

*and*

## Larry PETERSEN
and Homebuilders Association of Metropolitan Portland,
*Respondents.*

(LUBA Nos. 99-009, 99-010; CA A110947)

21 P3d 1108

David B. Smith argued the cause and filed the briefs for petitioners - cross-respondents.

Larry S. Shaw argued the cause and filed the brief for respondent cross-respondent Metro.

Jeffrey G. Condit argued the cause for respondents - cross-petitioners City of Lake Oswego and City of West Linn. With him on the brief was Miller Nash LLP.

Kathryn S. Beaumont, Senior Deputy City Attorney, filed a brief *amicus curiae* for City of Portland.

Christine M. Cook filed a brief for respondents Residents of Rosemont and David T. Adams, adopting the brief of respondents - cross-petitioners City of Lake Oswego and City of West Linn.

No appearance for respondents Lake Oswego School District No. 7J, West Linn-Wilsonville School District 3JT, City of Tualatin, Clackamas County, Larry Petersen, and Homebuilders Association of Metropolitan Portland.

Before Deits, Chief Judge, and Landau* and Brewer, Judges.

DEITS, C. J.

---

* Landau, J., *vice* Warren, S. J.

## DEITS, C. J.

Petitioners Rosemont Property Owners Assoc., Kuhl and Eiselius (petitioners) seek review of, and respondents City of Lake Oswego and City of West Linn (cities) cross-petition from, LUBA's decision remanding Metro's decision that amended its urban growth boundary (UGB) to add an 830-acre area. We affirm on the petition and reverse and remand on the cross-petition.

The parties agree that the facts are correctly stated in LUBA's opinion:

"On March 6, 1997, Metro designated 18,579 acres of land as urban reserves pursuant to OAR chapter 660, division 21, including lands in the Stafford area of Clackamas County. That area included five urban reserve study areas (URSAs) numbered 30, 31, 32, 33 and 34. On February 25, 1999, LUBA remanded Metro's decision in *D.S. Parklane Development, Inc. v. Metro*, 35 Or LUBA 516 (1999) (*Parklane I*), aff'd 165 Or App 1, 994 P2d 1205 (2000) (*Parklane II*).

"In 1998, Metro began proceedings to consider expanding its UGB in order to comply with a state mandate to provide a 20-year supply of residential land within the UGB. ORS 197.296. Pursuant to ORS 197.299, Metro was required to add to the UGB half of the amount of land needed to comply with ORS 197.296 by December 1998. Metro planning staff conducted various analyses that narrowed potential expansion sites to 26 URSAs, and then conducted further analyses that ranked those 26 URSAs as candidates for urbanization.

"On December 3, 1998, while the decision appealed in *Parklane I* was before LUBA, the Metro Council considered proposals to expand the UGB to include all of URSAs 31, 32, 33 and 34. The Council voted to remove more than half of the land in those URSAs from consideration, and approved an expansion of the UGB to include 830 acres of land in URSAs 31, 32 and 33, hereafter the 'expansion area' or the 'Rosemont area.' Proponents of including the Rosemont area in the UGB had developed a concept plan, the Rosemont Village Concept Plan (RVCP), proposing development in accordance with the requirements of Metro's 2040 Growth Concept. The 830-acre expansion area includes

approximately 762 acres of land zoned for exclusive farm use (EFU), with the remainder consisting of exception lands, *i.e.*, lands for which an exception to Statewide Planning Goal 3 (Agricultural Lands) had previously been taken. The soils on the EFU-zoned lands are predominantly Class III and IV soils.

"On December 17, 1998, the Council adopted Ordinance No. 98-782C, approving the challenged UGB expansion." (Footnotes omitted.)

The cities, among others, brought these consolidated appeals to LUBA, challenging various aspects of Metro's decision. Petitioners intervened in the LUBA proceeding to assert positions that generally supported the local decision. Although LUBA resolved many of the cities' critical arguments in their favor, it rejected their contention that Metro erred in basing the LUBA amendment on a "subregional need" for "affordable housing" in the general area of the cities and the proximate Stafford area, rather than determining the need for urban land by reference to the entire Metro region. In their cross-petition, which we address first, the cities' only assignment of error challenges that adverse ruling by LUBA.

■     The cities argue that it is inconsistent with Statewide Planning Goal 14 for a planning body to expand its UGB based on a need for housing or other urban facilities in only a part of its territory, at least without considering "whether that need could be accommodated outside of the identified subregion."[1] This court has not previously decided the question that the cities raise. However, in *1000 Friends of Oregon v. Metro Service Dist.*, 18 Or LUBA 311, 324 (1989), LUBA was presented with at least part of the question and concluded that,

---

[1] The cities also make arguments that, even assuming our rejection of their underlying contention, the "factual base" for and evidence supporting Metro's designation of the Stafford-Rosemont subregion were inadequate and that the Rosemont Village Concept Plan was insufficient to ensure that the subregional need would be met. We do not reach those secondary arguments.

As the parties and LUBA do, we will use the term "subregion" to refer to localized areas within a planning jurisdiction, as distinct from the "region" that constitutes all of the planning body's territory.

"within the Metro UGB a subregional need could also constitute a regional need for purposes of Goal 14 factors 1 and 2. * * * [W]e reject petitioner's contention that, as a matter of law, a subregional need could never provide a basis for amending Metro's regional UGB."

For the reasons that follow, we agree with LUBA that a subregional need may, in some circumstances, constitute need for purposes of satisfying factors 1 and 2 of Goal 14. We also conclude, however, that LUBA erred in affirming Metro's decision here, because, in deciding that factors 1 and 2 of Goal 14 were satisfied, Metro focused solely on what it identified as a subregional need without any consideration of this need in the regional context or any explanation of how this area was identified as a subregion or why the needs of this area should be viewed in isolation.

Goal 14 provides that the establishment and change of a UGB must be based on the following seven factors:

"(1)  Demonstrated need to accommodate long-range urban population growth requirements consistent with [statewide planning] goals;

"(2)  Need for housing, employment opportunities, and livability;

"(3)  Orderly and economic provision for public facilities and services;

"(4)  Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5)  Environmental, energy, economic and social consequences;

"(6)  Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7)  Compatibility of the proposed urban uses with nearby agricultural activities." *See also* Metro Code (MC) 3.01.020(b)(1) and (2).[2]

---

[2] MC 3.01.020(b), which implements factors 1 and 2 of Goal 14, provides in relevant part:

"(1)  Factor 1:  Demonstrated need to accommodate long-range urban population growth.

The first two factors are generally referred to as the "need" factors, and their principal concern is with the amount of land that is needed within a UGB. The remaining five factors are called the "locational" factors, and their principal concern is where the UGB should be situated. *See, e.g., Halvorson v. Lincoln County*, 82 Or App 302, 305, 728 P2d 77 (1986).

On review, the cities argue that the determination of "need" under factors 1 and 2 of Goal 14 must be based on the regional planning area and that expansion of a UGB may not be based on a subregional need, at least not without considering such need in the context of regional needs and whether that need can otherwise be addressed in the region. The appropriate role of subregional needs in a determination of whether the expansion of the UGB at a particular location is

"(A)  The district shall develop 20-year Regional Forecasts of Population and Employment, which shall include a forecast of net developable land need * * *. After deliberation upon all relevant facts the district shall adopt a forecast. * * * Concurrent with the adoption of the district's growth forecast, the district shall complete an inventory of net developable land, providing the opportunity for review and comment by all cities and counties in the district.

"(B)  The forecast and inventory, along with all other appropriate data shall be considered by the district in determining the need for urban developable land. The results of the inventory and forecast shall be compared, and if the net developable land equals or is larger than the need forecast, then the district council shall hold a public hearing, providing the opportunity for comment. * * *

"(C)  If the inventory of net developable land is less than the need forecast, the district shall conduct a further analysis of the inventory to determine whether any significant surplus of developable land in one or more land use categories could be suitable to address the unmet forecasted need. * * *

"(D)  For consideration of a legislative UGB amendment, the district council shall review an analysis of land outside the present UGB to determine those areas best suited for expansion of the UGB to meet the identified need.

"(E)  The district must find that the identified need cannot reasonably be met within the UGB * * *.

"(2)  Factor 2:   Need for housing, employment opportunities and livability may be addressed under either subsection (A) or (B) or both, as described below.

"(A)  For a proposed amendment to the UGB based upon housing or employment opportunities the district must demonstrate that a need based upon an economic analysis can only be met through a change in the location of the UGB. For housing, the proposed amendment must meet an unmet need according to statewide planning Goal 10 and its associated administrative rules. * * *"

justified is presented to us as a legal question. Of course, our answer to this legal inquiry has significant policy and planning implications. We recognize that, in reality, housing, job opportunities and other exigencies calling for urban support can arise in areas of a local planning jurisdiction that were not part of, or are far removed from, the territory that was included in the locality's UGB when it was first established. That fact is particularly germane in connection with a governmental entity like Metro, the planning authority of which extends to numerous cities and counties covering an enormous amount of land that ranges in kind and distance from the urban center in Portland to the prime agricultural areas of Washington and Clackamas Counties. Ideally, the statutes and rules adopted by the appropriate policymakers would provide a clear answer as to the proper role of subregional needs in deciding, under Goal 14, if an established UGB should be expanded. Unfortunately, this question is not *directly* addressed in any of the pertinent laws to which we are directed.

■  The cities acknowledge at the outset that, read in isolation, the text of "factor 2 suggests that a special need for housing can justify an expansion even in the absence of a determination of long-term regional population needs." However, the cities understand us to have said otherwise in *Baker v. Marion County*, 120 Or App 50, 852 P2d 254, *rev den* 317 Or 485 (1993). They rely on our statement that,

> "even if the [UGB expansion] proposal complied with one of the two factors, that would not suffice to show need, at least without appropriate consideration of and weight being accorded to the proposal's failure to satisfy the other factor. The need factors are interdependent * * *." *Id.* at 54.

The cities are correct that, in *Baker*, we rejected the argument that a UGB expansion was permissible *per se* if it satisfied either of the need factors, without regard for the other. We held in *Baker* that factors 1 and 2 of Goal 14 are interdependent and that, if one of the factors is not fully satisfied, or is less determinative, that factor must still be considered and discussed in deciding if a need for expansion of a UGB has been shown under factors 1 and 2 of Goal 14.[3] The establishment of a need for housing in a particular area under factor 2

---

[3] A pertinent provision of the Metro Code, MC 3.01.020(b), also supports this conclusion:

does not, in itself, establish a need to expand the UGB. As we will discuss, such a subregional need must be considered in the regional context.

The cities also rely on our decision in *Benjfran Development v. Metro Service Dist.*, 95 Or App 22, 767 P2d 467 (1989), to support the contention that a UGB expansion may not be justified based on a subregional need "without assessing the ability of the current UGB to meet that need." In that case, the petitioners argued that, under ORS 197.707 *et seq.* and Goal 9, local governments were required to treat economic development as a *per se* need under factors 1 and 2 of Goal 14. In rejecting that argument, we said that the petitioners' argument would require "local governments * * * to find a need to urbanize land to accommodate *every* [economically motivated] developmental proposal, regardless of the adequacy of currently urbanized or urbanizable land to serve the economic development requirements of the locality." *Id.* at 26 (emphasis in original). We did not hold in *Benjfran Development* that *no* "subregional" urban-level service or facility requirements can ever constitute or contribute to a determination of "need" under factors 1, 2 or both. We held that not *every* urbanization proposal of a particular kind *necessarily does* constitute such a need. Whether the particular proposal satisfies factors 1 and 2 of Goal 14 depends on an assessment of all of the particular circumstances.

■    Considering the text and context of the pertinent laws, we believe that LUBA was correct in holding that it cannot be said, as a matter of law, that a subregional need will *never* satisfy the need factors of Goal 14. However, we also conclude that there is nothing in the text or context of Goal 14 or those portions of the Metro Code implementing Goal 14 that provides authority for a subregional need *alone* to serve as the basis for a UGB expansion without consideration being given to the "regional context." As LUBA explained in an early decision on this subject:

---

"While all of the following Goal 14 factors must be addressed, the factors cannot be evaluated without reference to each other. Rigid separation of the factors ignores obvious overlaps between them. Demonstration of compliance with one factor or subfactor may not constitute a sufficient showing of compliance with the goal to the exclusion of the other factors, when making an overall determination of compliance or conflict with the goal. * * *"

"As a regional urban growth boundary, Metro's boundary looks to growth trends on a regional basis and is designed to accommodate regional growth. Changes within jurisdictions served by Metro may be necessary to accommodate that regional growth, *but the Board does not agree with the petitioner that only the growth in Clackamas County is relevant in deciding whether the urban growth boundary in Clackamas County needs to be amended.* Without a showing by petitioner as to how the Clackamas County urban growth boundary is critical to the regional urban growth boundary in some manner requiring it to be viewed by itself, we believe we would be doing more harm than good by accepting petitioner's proposition." *Home Builders Ass'n v. Metropolitan Service District*, 2 Or LUBA 25, 30 (1980) (emphasis added).

In order to satisfy the need factors of Goal 14, a subregional need must be identified and evaluated in the context of the regional needs. *See 1000 Friends of Oregon v. Metro*, 38 Or LUBA 565, 570-81 (2000) (LUBA concluded that Metro properly identified a subregional need for housing and considered the role that need plays in the context of the entire UGB and regional need).

■ Here, Metro's decision to expand the UGB in the Stafford-Rosemont area appears to have been based *solely* on subregional considerations of the kind reflected in factor 2. As the cities argue:

"Metro's decision in this case was based solely on a determination of need for affordable housing within three or six miles of the Stafford and Rosemont intersection, and did not consider whether that need could be accommodated outside of the identified subregion." (Footnotes omitted.)

We agree with the cities that Metro erred in that respect and that LUBA accordingly erred in affirming that aspect of Metro's decision. To illustrate, there might be some *a priori* logic to the proposition that persons employed on the rural fringe of Clackamas County cannot be adequately accommodated by housing on the urban fringes of Multnomah and Washington Counties. However, there is no corresponding logic to the proposition that Metro appears to have found decisive here, *i.e.*, that a determinative housing need

could be established solely by reference to areas in close proximity to the preselected site of the proposed UGB expansion and without *any* consideration of other parts of the regional planning territory. Metro's decision does not explain why the affordable housing must lie within a six-mile radius of the Stafford-Rosemont intersection, let alone why that intersection may appropriately be treated as the nucleus of an identifiable subregion or of the subregion to which virtually exclusive consideration was given as the site of the expansion. We hold that Metro's present supportive showing for its decision does not satisfy Goal 14 in this regard.

■    LUBA also agreed with Metro that, in addition to Goal 14, ORS 197.298(3) provided authority for Metro to base the UGB expansion on the subregional need that it identified. ORS 197.298 provides, as material:

"(1)   In addition to any requirements established by rule addressing urbanization, land may not be included within an urban growth boundary except under the following priorities:

"(a)   First priority is land that is designated urban reserve land under ORS 195.145, rule or metropolitan service district action plan.

"(b)   If land under paragraph (a) of this subsection is inadequate to accommodate the amount of land needed, second priority is land adjacent to an urban growth boundary that is identified in an acknowledged comprehensive plan as an exception area or nonresource land. Second priority may include resource land that is completely surrounded by exception areas unless such resource land is high-value farmland as described in ORS 215.710.

"(c)   If land under paragraphs (a) and (b) of this subsection is inadequate to accommodate the amount of land needed, third priority is land designated as marginal land pursuant to ORS 197.247 (1991 Edition).

"(d)   If land under paragraphs (a) to (c) of this subsection is inadequate to accommodate the amount of land needed, fourth priority is land designated in an acknowledged comprehensive plan for agriculture or forestry, or both.

"* * * * *

"(3)  Land of lower priority under subsection (1) of this section may be included in an urban growth boundary if land of higher priority is found to be inadequate to accommodate the amount of land estimated in subsection (1) of this section for one or more of the following reasons:

"(a)  Specific types of identified land needs cannot be reasonably accommodated on higher priority lands;

"(b)  Future urban services could not reasonably be provided to the higher priority lands due to topographical or other physical constraints; or

"(c)  Maximum efficiency of land uses within a proposed urban growth boundary requires inclusion of lower priority lands in order to include or to provide services to higher priority lands."

LUBA relied on ORS 197.298(3)(a) and reasoned that "local governments [may] include lower priority lands within the UGB where higher priority lands are unable to accommodate '[s]pecific types of identified land needs,'" such as affordable housing. We do not agree that ORS 197.298(3) has any decisive effect here or that it can independently authorize Metro's action. Subsection (3) simply provides exceptions to the priority requirements of subsection (1). It presupposes that the priority determinations under subsection (1) have been made and that the exceptions it establishes relate only to the inclusion of land that comes within the priority concerns described in subsection (1). *See D. S. Parklane Development, Inc. v. Metro*, 165 Or App 1, 20, 994 P2d 1205 (2000) (stating corresponding interpretation of prioritization provisions of urban reserve rules). Those priority concerns do not purport to be the exclusive considerations governing the location of UGBs, and ORS 197.298(3) does not purport to excuse compliance with Goal 14's requirements for the establishment or change of UGBs. ORS 197.298 specifically provides that the priorities for UGB inclusion that it sets forth are "[i]n addition to any requirements established by rule addressing urbanization." Metro contends that it is impossible to implement the requirements of ORS 197.296 and ORS 197.298 *and* the requirements of Goal 14. Because of that, it asserts that the provisions must be read together. The problem with that argument, however, is that, because ORS 197.298 specifically provides that its requirements are *in*

*addition* to the urbanization requirements of Goal 14, which are particularly directed to the establishment and change of UGBs, it cannot be said that the statute was intended to supersede Goal 14.

Consequently, we reverse and remand on the cross-petition. We turn to the petition. Petitioners make four assignments of error. First, petitioners argue that LUBA erred when it held that, under Goal 2[4] and this court's decision in *D. S. Parklane,* Metro was precluded from using projection reports of population growth that were not part of Metro's Functional Plan adopted pursuant to ORS chapter 268. In making its decision to allow this expansion of the UGB, Metro relied on UGB capacity estimates included in the 1997 Urban Growth Report (UGR), the draft 1998 Urban Growth Report Addendum (UGRA), and the October 1998 Urban Growth Boundary Assessment of Need (UGBAN). These documents estimate a lower 20-year housing capacity within the existing UGB than the UGB capacity estimates in Metro's Urban Growth Management (UGM) Functional Plan and, consequently, support a much larger UGB expansion.

Petitioners argue that LUBA erred because Goal 2 does not require that growth projections must be in an acknowledged planning document. LUBA's and this court's earlier decisions in *D. S. Parklane,* however, were not based on the premise that the UGM Functional Plan was acknowledged, but on the fact that it was adopted to implement Metro's Regional Urban Growth Goals and Objectives and its Regional Framework Plan. For the reasons explained by LUBA in its decision in this case, we continue to believe that Metro's reliance on the projections in the UGR, UGRA, and UGBAN was wrong.

We note that petitioners contended at oral argument that LUBA's recent holding in *1000 Friends of Oregon v. Metro,* 38 Or LUBA 565 (2000), that Metro could use UGB capacity estimates from the UGR because this information was part of the RFP requires us to conclude that LUBA erred

---

[4] Goal 2 requires, in pertinent part, that:

"City, county, state and federal agency and special district plans and actions related to land use shall be consistent with the comprehensive plans of cities and counties and regional plans adopted under ORS Chapter 268."

in this case in deciding that Metro could not rely on the population projections from the UGR. However, as LUBA noted in its decision in *1000 Friends of Oregon v. Metro*, the argument on which its decision was based in that case was not made to LUBA here. Consequently, we decline to conclude that LUBA committed legal error in this case in holding that Metro could not use UGB capacity estimates from the UGR.

■     Petitioners' second assignment of error is that LUBA erred in concluding that Goals 2 and 14 apply directly to Metro's decision to expand the UGB. We conclude that LUBA was correct that a decision to amend the Metro UGB is a decision to amend a comprehensive plan and that, consequently, the goals apply directly to such a decision. Again, for the reasons articulated by LUBA, we hold that the provisions of the Metro Code do not exempt UGB amendments from the requirement that compliance with Goals 2 and 14 must be demonstrated.

■     Petitioners also argue that LUBA erred in construing ORS 197.298(3)(a) and OAR 660-004-0010(1)(c)(B)(ii) (criterion ii), when it held that Metro failed to comply with those provisions because there were no exception areas in the subregion that could reasonably accommodate the proposed Rosemont Village Concept Plan.[5] Metro took an exception to Goal 3 for the 762 acres of EFU land that it sought to add to its UGB. LUBA held that Metro's findings concerning that land did not satisfy a number of provisions, including OAR 660-004-0010(1)(c)(B)(ii). Petitioners argue that LUBA erred by failing *also* to consider and apply OAR 660-004-0020, under which, they maintain, the exception would have passed muster.

OAR 660-004-0020 relates generally to the requirements for goal exceptions. OAR 660-004-0010(1)(c)(B) is specifically applicable "[w]hen a local government changes an established" UGB, and criterion ii of that rule requires a demonstration that "[a]reas which do not require a new exception cannot reasonably accommodate the use[.]" This

---

[5] We address only the part of the argument relating to the rule. To the extent it is separable, petitioners' statutory argument does not merit discussion.

case involves a change to a UGB and, consequently OAR 660-004-0010(1)(c)(B) applies. Again, for the reasons that LUBA articulated, the new exception that Metro took was invalid. Therefore, the new exception that Metro purported to take was impermissible under OAR 660-004-0010 and it is academic how the exception might have fared under OAR 660-004-0020.[6]

Finally, petitioners argue that LUBA erred in holding that, under ORS 197.298(1)(b), the Stafford area included in the UGB expansion was not "completely surrounded" by exception lands. For the reasons stated by LUBA, and because the expansion area was bordered to the south by high-value resource lands, LUBA's interpretation of the statute is compelled by its text and context.

Affirmed on petition; on cross-petition reversed and remanded for further proceedings not inconsistent with this opinion.

---

[6] Assuming that the question may arise on remand, we agree with LUBA that the "reasonably accommodate" inquiry in criterion ii is whether the areas that do not require a new exception *can* accommodate the use at all, not whether they can do so as efficiently or beneficially as the proposed exception area might.