Argued and submitted September 23, 2004, on petitions of City of West Linn and City of Portland, OAR 660-026-0000 to 660-026-0040 held invalid; 1000 Friends of Oregon's petition dismissed June 15, petition for review denied December 13, 2005

(339 Or 609)

CITY OF WEST LINN,
*Petitioner,*

*v.*

LAND CONSERVATION
AND DEVELOPMENT COMMISSION,
*Respondent,*

*and*

METRO,
*Intervenor-Respondent.*

CITY OF PORTLAND,
*Petitioner,*

*v.*

LAND CONSERVATION
AND DEVELOPMENT COMMISSION,
*Respondent,*

*and*

METRO
and Washington County,
*Intervenors-Respondents.*

1000 FRIENDS OF OREGON,
*Petitioner,*

*v.*

LAND CONSERVATION
AND DEVELOPMENT COMMISSION,
*Respondent,*

*and*

METRO,
*Intervenor-Respondent.*

1-2003; A120189 (Control), A120957, A120979
(Cases Consolidated)

113 P3d 935

Peggy Hennessy argued the cause for petitioner City of West Linn. With her on the briefs was Reeves, Kahn & Hennessy.

Frank Hudson, Deputy City Attorney, argued the cause and filed the briefs for petitioner City of Portland.

Mary Kyle McCurdy argued the cause and filed the briefs for petitioner 1000 Friends of Oregon.

Steven Shipsey argued the cause for respondent Land Conservation and Development Commission. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General.

Richard P. Benner argued the cause and filed the brief for intervenor-respondent Metro.

Danny R. Olsen, County Counsel, filed the brief for intervenor-respondent Washington County.

Before Haselton, Presiding Judge, and Linder, Judge, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

## DEITS, J. pro tempore

Petitioners, the City of West Linn, the City of Portland, and 1000 Friends of Oregon, seek judicial review of rules promulgated by the Land Conservation and Development Commission (LCDC). Those rules allow Metro to define "subregions" within its regional urban growth boundary (UGB), allocate a regional need for land to those subregions, and amend its regional UGB if lands within or near a subregion are inadequate to accommodate the subregion's need.[1] OAR 660-026-0000 to 660-026-0040. On review, petitioners assert that LCDC's rules are invalid because they depart from the legal standard expressed in the pertinent statutes and statewide land use planning goals. *See* ORS 183.400(4)(b) (providing that "[t]he court shall declare the rule invalid only if" it determines that the rule "[e]xceeds the statutory authority of the agency"). For reasons that we will explain, we conclude that the rules are invalid.

■ We begin with the issue of petitioners' standing to seek judicial review. With regard to standing, ORS 183.400(1) provides that "[t]he validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases." In turn, a "person" includes a corporation, such as 1000 Friends of Oregon, and governmental subdivisions, such as West Linn and Portland. ORS 183.310(8). Here, West Linn, Portland, and 1000 Friends of Oregon have statutory standing to seek review of LCDC's rules.

■■ In addition to statutory standing, a petitioner must also have constitutional standing. In other words, a petitioner must demonstrate that a decision in the case will have a practical effect on his or her rights. *Kellas v. Dept. of Corrections*, 190 Or App 331, 334, 78 P3d 1250 (2003), *rev allowed*, 337 Or 282 (2004) (for purposes of constitutional standing, "a petitioner seeking to challenge a rule under ORS

---

[1] A "regional urban growth boundary" is "an urban growth boundary adopted by a metropolitan service district organized under ORS chapter 268." OAR 660-026-0010(5). Additionally, a "subregion" is "a distinct geographic area within the regional UGB that has been established by the district consistent with the requirements of OAR 660-026-0030." OAR 660-026-0010(6).

183.400 must demonstrate that he or she has a legally recognized interest at stake and that the relief sought—validation or invalidation of an administrative rule—would have a practical effect on that interest"). As we have explained, the challenged rules concern amendments to the regional UGB in the Portland metropolitan area, the determination of land needs, and the allocation of those needs based on subregions as defined by Metro. The validation or invalidation of those rules will have a practical effect on the interests of West Linn and Portland.

■    With regard to 1000 Friends of Oregon, its executive director submitted an affidavit with the petition for judicial review. In that affidavit, the director asserts that the "corporate and organizational interests" of 1000 Friends of Oregon "are adversely affected" by the rules because they "authorize planning and urban growth boundary expansions in the Portland metropolitan area[.]" For example, according to the director,

> "1000 Friends of Oregon in December completed a two year planning effort to design an urban growth concept for the Damascus area of Clackamas County, approximately 10,000 acres of mostly rural residential land that, under the law in effect prior to the adoption of the 'subregional need' rule, is a higher priority for inclusion in the Metro urban growth boundary than farm and forest land in other parts of the region. 1000 Friends' study identified how the Damascus area can meet Metro's long-term population and employment needs if converted to carefully designed urban communities, making loss of farmland unnecessary for many years.

> "Following release of 1000 Friends' work, the Metro Council voted to include the Damascus area in the regional urban growth boundary. This should have meant there would be no need to consider further expansions for the foreseeable future. Under the subregional rule, however, Washington County and Hillsboro will now argue, and Metro can decide, that Hillsboro should be able to estimate 'need' for growth in its 'subregion' without consideration of the land supply for urban development that has just been made available in Damascus. The effect of the subregional rule will be to allocate land for the same jobs and housing in

two locations at once, and to allow the paving over of farm-land in Washington County. This is sprawl. This is the mid-twentieth-century growth pattern that our organization exists to oppose and to reform. This is the fundamental interest of 1000 Friends of Oregon that is adversely affected by the rule we seek to review."

Although 1000 Friends of Oregon has clearly explained its dissatisfaction with the challenged rules, its explanation expresses only "philosophical and political disagreement with LCDC's decision." *Polk County v. DLCD*, 199 Or App 501, 507, 111 P3d 1140 (2005) (holding that, for similar reasons, 1000 Friends of Oregon lacked standing). Under *Polk County*, without an assertion that 1000 Friends or its members have suffered or will suffer a practical effect as a result of a decision in this case, we are required to dismiss 1000 Friends of Oregon's petition for review.

Nonetheless, we address the arguments raised by 1000 Friends of Oregon because Portland incorporated those arguments into its brief on review.[2] Additionally, we refer collectively to "petitioners" throughout this opinion without attributing particular arguments to an individual petitioner.

Before turning to the parties' arguments, we consider the nature of our review because it has a significant effect on our analysis. LCDC contends that a rule challenge under ORS 183.400 is a "facial" challenge. According to LCDC, "[t]he concept of a 'facial' versus an 'as applied' challenge is essentially no different for a rule challenge than it is for a challenge to the constitutionality of a statute. Thus, a facial challenge cannot succeed unless it can establish that the challenged enactment could not be validly applied in *any* scenario." (Emphasis in original.) In this case, LCDC contends

---

[2] ORAP 5.77(1) provides that,

"[i]n a case involving more than one party on the same side, including cases consolidated on appeal, the court discourages the filing of briefs that duplicate arguments made in another brief in the same case and encourages parties to file joint briefs or to adopt to the extent practicable a brief filed by another party in the same case."

Here, we granted Metro's motion to consolidate the three cases on judicial review for oral argument and briefing pursuant to ORAP 2.30, which provides, in part, that "[t]he appellate court, on motion of a party or on its own motion, may consolidate cases for purposes of appeal."

that "petitioners cannot prevail in their facial challenge unless they can demonstrate that the rules are not capable of *any* application that is consistent with the governing statutes." (Emphasis in original.)

■■ We rejected the same argument in *WaterWatch v. Water Resources Commission*, 199 Or App 598, 604-05, 112 P3d 443 (2005):

> "We disagree with respondents' view of the nature of our review in a rule challenge. Although we and the Supreme Court have used the words 'facial' and 'as applied' in discussing our review of administrative rules, we do not understand that the use of those terms imported a new means of review for rule challenges pursuant to ORS 183.400. Instead, Oregon courts have used those terms to describe the following principles: In a rule challenge pursuant to ORS 183.400, 'judicial review * * * is limited to the face of the rule and the law pertinent to it. Numerous individual fact situations can arise under any rule, but judicial review of the rule as applied to each of those situations is reserved to other forums.' *AFSCME Local 2623 v. Dept. of Corrections*, 315 Or 74, 79, 843 P2d 409 (1992). Our task in a rule challenge pursuant to ORS 183.400 is to determine whether 'the substance of the action, though within the scope of the agency's or official's general authority, departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute.' *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984); *see also Beaver Creek Coop. Telephone Co. v. PUC (A109890)*, 182 Or App 559, 50 P3d 1231 (2002) (applying the standard from *Planned Parenthood Assn.*)."

(Omission in original; footnote omitted.) In sum, a rule departs from a statutory standard if the rule on its face affirmatively authorizes actions that violate the statutory standard. Further, when an administrative rule that purports to implement a statewide land use planning goal is challenged pursuant to ORS 183.400, the rule may be held invalid if it departs from the standard expressed in the goal. *See Willamette University v. LCDC*, 45 Or App 355, 608 P2d 1178 (1980).[3] With those principles in mind, we turn to petitioners'

---

[3] In *Willamette University*, on review of an LCDC order concerning a Eugene ordinance, we held an LCDC rule invalid, reasoning that,

challenges concerning whether the rules depart from the legal standard expressed in the pertinent goals and statutes.

■     In this case, the challenged rules implement Goal 2, Goal 14, and ORS 197.732. *See* OAR 660-026-0000 ("This Division describes how ORS 197.295 to 197.302, 197.732, Goals 2 and 14, and OAR chapter 660, division 004 apply to the administration of a regional [UGB]."). According to petitioners, Goal 14, which governs the conversion of rural land to urban land, applies to the amendment of an acknowledged UGB and such an amendment must satisfy the requirements for an exception to Goal 14. *See* ORS 197.732 (establishing goal exception criteria); Goal 2, Part II (governing goal exceptions). We understand petitioners to contend that those provisions require a district to identify a regional need for land and to determine that the identified need cannot be reasonably accommodated with lands that do not require a new goal exception. According to petitioners, the challenged rules violate that standard.

Specifically, petitioners argue that the rules allow Metro to allocate a regional need among up to five subregions without first determining whether areas that do not require a new exception, either inside or outside the UGB, can accommodate the identified need. As a consequence, petitioners contend, the rules narrow the geographic scope of the lands that Metro must consider to satisfy the identified need to those lands within the UGB that are within or near the

---

"[o]rdinarily, a conflict in an agency's regulations would raise the possibility that the latter is an implied repeal or amendment of the former. That possibility does not arise in this context. The legislature has delegated separate responsibilities to LCDC: first, and more specifically, to adopt the statewide planning goals, ORS 197.040(2)(a), 197.225; second and more generally, to 'promulgate rules,' ORS 197.040(1)(b). In this statutory scheme, the goals occupy a preferred position. There are, for example, special procedures required, over and above the general rulemaking procedures of the Administrative Procedures Act, for LCDC's adoption or revision of the statewide planning goals. ORS 197.235 to 197.245. From this scheme, we conclude the legislature did not intend that the statewide planning goals could be indirectly repealed or amended by any exercise by LCDC of its general rulemaking power."

45 Or App at 374; *see also McKnight v. LCDC*, 74 Or App 627, 704 P2d 1153 (1985) (holding that a rule purporting to implement a goal exceeded LCDC's statutory rule-making authority and, accordingly, was invalid because the rule's requirements had no basis in the goals).

affected subregion. In other words, under the rules, Metro does not consider land that is within the regional UGB that could satisfy the need if the land is not within or near the affected subregion.

Petitioners summarize their understanding of the way in which the rules will function. They assert that,

> "under the rule, Metro could divide the region into five sub-regions, based on 'objectives' that are yet to be included in its Regional Framework Plan (RFP) and that do not include a requirement to examine all areas that could reasonably accommodate the need, in and around the UGB, and that do not include consideration of any of the Goal 14 factors other than factor 4. Metro could then find that it has a regional need for housing and allocate that need to the subregions. If Metro concludes that the subregion including western Washington County does not have sufficient land inside that part of the UGB to accommodate the allocated need, and there are no exception areas near that subregion, Metro could expand the UGB on to land designated for agricultural use, even though another subregion could accommodate some or all of that need within the existing UGB, or on exception areas near that subregion's portion of the UGB. This violates ORS 197.732(1)(c)(B) and related rules and Goal 2.
>
> "* * * * *
>
> "The petitioner's argument is consistent with what this court has already held concerning a subregional analysis of the Metro UGB. In *Residents of Rosemont[ v. Metro*, 173 Or App 321, 327, 21 P3d 1108 (2001)], this court found that while a subregional need analysis could provide a basis for expanding the Metro UGB under Goal 14, it could not be done without consideration of the regional context. The court specifically rejected Metro's argument that a determinative need for housing could be established solely by reference to areas in close proximity to the preselected site of the proposed UGB expansion without any consideration of other parts of the regional planning territory. Here, predetermining the subregion without evaluating whether other areas in the region could reasonably accommodate the need removes the UGB analysis from the regional context."

(Internal quotation marks and citations omitted.)

Additionally, petitioners contend that the rules depart from the standard in ORS 197.298, a statute establishing priorities for bringing different types of land into the UGB and providing exceptions to those priorities. According to petitioners, the rules violate the standard in that statute by requiring Metro to consider a subregion's need in determining which lands to bring into its UGB. As a consequence, petitioners assert that, under the rules, Metro may choose lower priority lands before higher priority lands, contrary to the requirements of the statute.

LCDC responds that the rules are valid because they

"contain internal checks to ensure that they are applied in a way that is consistent with the goals and the statute. Each step in the process of applying the rules, including designation of subregions and allocation of need, is subject to LCDC acknowledgment for compliance with the goals, as is the end product, specific changes to the regional [UGB]. These steps ensure that, as applied, the rules will be consistent with the policies and requirements expressed in the applicable statutes and rules."

LCDC also contends that the rules do not circumvent the priorities established by ORS 197.298.[4] In light of our disposition of petitioners' first argument, there is no need for us to address petitioners' arguments concerning whether the rules violate ORS 197.298, the statute governing the priorities for inclusion of land in the UGB.

We begin our analysis by examining the pertinent text of Goal 14 and Goal 2. Goal 14 provides that the establishment and change of a UGB must be based on the following factors:

"(1)   Demonstrated need to accommodate long-range urban population growth requirements consistent with LCDC goals;

---

[4] On review, Metro intervened in all three cases that were consolidated and Washington County intervened in the case involving Portland. Washington County incorporated Metro's brief into its brief. Similarly to LCDC, Metro asserts that (1) the rules do not violate Goal 2, Goal 14, or ORS 197.732 because they "incorporate[ ] the Goal 14 requirement that Metro must demonstrate that need cannot be accommodated in other parts of the region before Metro can decide to accommodate it in a subregion[,]" and (2) the rules do not violate ORS 197.298. For those reasons and for convenience, we refer to LCDC throughout this opinion.

"(2) Need for housing, employment opportunities, and livability;

"(3) Orderly and economic provision for public facilities and services;

"(4) Maximum efficiency of land uses within and on the fringe of the existing urban area;

"(5) Environmental, energy, economic and social consequences;

"(6) Retention of agricultural land as defined, with Class I being the highest priority for retention and Class VI the lowest priority; and,

"(7) Compatibility of the proposed urban uses with nearby agricultural activities.

"The results of the above considerations shall be included in the comprehensive plan. In the case of a change of a boundary, a governing body proposing such change in the boundary separating urbanizable lands from rural land, shall follow the procedures and requirements as set forth in the Land Use Planning goal (Goal 2) for goal exceptions."

As pertinent to this case, the Goal 2 exception requirements allow a local government to adopt an exception to a goal if, among other things, "[a]reas which do not require a new exception cannot reasonably accommodate the use[.]" That quoted requirement from Goal 2 is identical to the requirement in ORS 197.732(1)(c)(B), the statute governing goal exceptions.

■        The goals and the statute apply when a jurisdiction chooses to amend its UGB. In particular, as noted above, Goal 14 contains seven factors on which a jurisdiction must base its decision to amend its existing UGB.

"The first two factors are generally referred to as the 'need' factors, and their principal concern is with the amount of land that is needed within a UGB. The remaining five factors are called the 'locational' factors, and their principal concern is where the UGB should be situated."

*Residents of Rosemont v. Metro*, 173 Or App 321, 327, 21 P3d 1108 (2001). In determining whether to amend its regional UGB, a jurisdiction must consider those seven factors within

the context of its existing UGB. This court's decision in *Residents of Rosemont* illustrates that proposition.

In *Residents of Rosemont*, Metro amended its UGB to add 830 acres of land, including land zoned for exclusive farm use and land for which an exception previously had been taken. On review, we noted that Metro's UGB is designed to accommodate growth on a *regional basis* and that Metro's decision to expand its UGB appeared to have been based on the proposition that "a determinative housing need could be established solely by reference to areas in close proximity to the preselected site of the proposed UGB expansion and without *any* consideration of other parts of the regional planning territory." *Id.* at 330-31 (emphasis added). The cities argued

> "that the determination of 'need' under factors 1 and 2 of Goal 14 must be based on the regional planning area and that expansion of a UGB may not be based on a subregional need, at least not without considering such need in the context of regional needs and whether that need can otherwise be addressed in the region."

*Id.* at 327.

On review, we rejected the contention that, as a matter of law, a subregional need could never provide a basis for amending Metro's regional UGB, concluding that "a subregional need may, in some circumstances, constitute need for purposes of satisfying" the need factors of Goal 14. *Id.* at 326. In reaching that conclusion, however, we explained that

> "there is nothing in the text or context of Goal 14 or those portions of the Metro Code implementing Goal 14 that provides authority for a subregional need *alone* to serve as the basis for a UGB expansion *without consideration being given to the 'regional context.'* "

*Id.* at 329 (second emphasis added).[5]

---

[5] In *Residents of Rosemont*, we also stated that, "[i]n order to satisfy the need factors of Goal 14, a subregional need must be identified and evaluated in the context of the regional needs." 173 Or App at 330. Read in the context of the issue presented in that case, the statement does not mean that, before a jurisdiction may allocate its regional need to subregions, it must consider how to accommodate that need in the context of the entire region. A jurisdiction can identify and allocate a regional need to a subregion based on the "need" factors of the Goal 14 process. The error in *Residents of Rosemont* was that the jurisdiction was attempting to use a

■     We recognize that our decision in *Residents of Rosemont* focused on the need factors of Goal 14. The gravamen of our decision, however, was that, because the seven factors in Goal 14 concern the regional need for additional lands and whether lands within the existing UGB can accommodate that identified regional need, Metro must evaluate all of the factors in Goal 14 in the context of its existing regional UGB. Our decision in *Residents of Rosemont* is consistent with the purpose of Goal 14, which is "[t]o provide for an orderly and efficient transition from rural to urban land" and with one of the requirements in Goal 2 and in ORS 197.732(1)(c)(B) that, before a jurisdiction may amend its UGB, it must determine, among other things, that "[a]reas which do not require a new exception cannot reasonably accommodate the use." Thus, consistently with *Residents of Rosemont,* we conclude that, in determining whether there is land within the existing UGB that could accommodate a need or whether the UGB must be expanded to include additional lands, Goal 14 requires a jurisdiction to consider and evaluate the locational factors in the context of the entire region.

With that in mind, the critical question in this case is whether OAR 660-026-0000 to 660-026-0040 depart from the legal standard that, in determining whether to amend its UGB, Metro must consider the locational factors of Goal 14 in the context of its regional UGB and cannot limit its consideration and evaluation of those factors to the lands in or near a particular subregion. OAR 660-026-0020 requires that a district[6] determine the regional need, based, in part, on the need factors of Goal 14. Under the rules, once the district determines the regional need, it may allocate that need to subregions. OAR 660-026-0030. The district's subregional allocation

---

subregional need to justify a regional UGB amendment without consideration of regional need. As we explain later in this opinion, the holding in *Residents of Rosemont* leads to our conclusion in this case—that is, in determining whether to expand a regional UGB to satisfy a need in a subregion, a jurisdiction must consider available land within the regional UGB and cannot limit its consideration to land within or near the subregion. In other words, the locational factors of Goal 14 apply to the entire regional UGB and are not limited to only those areas within or near the subregion.

     [6] For purposes of the rules, a "district" is defined to mean "a metropolitan service district organized under ORS chapter 268 that administers a regional UGB (e.g., Metro)." OAR 660-026-0010(2).

"shall be based on provisions of the district's regional framework plan that:

"(a)    Are adopted by the district, and acknowledged by the Commission, through periodic review pursuant to ORS 197.628 to 197.650; and

"(b)    Expressly authorize an allocation of need through a subregional approach that:

"(A)    Clearly indicates the location of the subregions, including maps and other pertinent descriptions of fixed, non-overlapping boundaries for each subregion;

"(B)    Limits the number of subregions to no more than five, each containing one or more regional centers and/or the central city, and a current population that is at least 15 percent of the population of the regional UGB; and

"(C)    Sets forth the objectives to be achieved by allocation of regional need to subregions."

OAR 660-026-0030(2).

In support of its allocation of the regional need, the district must make findings that

"(a)    Explain how the allocation achieves the objectives of the district's regional framework plan;

"(b)    Demonstrate that, as a result of the large size of the regional UGB, the allocation of regional need to subregions will achieve a greater efficiency of land uses within and on the fringe of the regional urban area than would be achieved without subregional allocation;

"(c)    Explain how the subregional need of each subregion fits within the regional context; and

"(d)    For each subregion, explain why the area is identified as a subregion; and explain why the needs of the subregion should be viewed in isolation."

OAR 660-026-0030(3). Those findings and any subsequent UGB amendment must be reviewed by LCDC during the periodic review process. OAR 660-026-0030(4).

If the district allocates the regional need to subregions as provided by the rules, OAR 660-026-0040(1) provides, in part:

"[T]he district shall first determine *what portion (if any) of the need can be reasonably accommodated on lands currently within the existing regional UGB that are within or near each subregion,* in the manner provided by ORS 197.296(6)(b), OAR 660-004-0010(1)(c)(B)(ii) and 660-004-0020(2)(b). The analysis under this section shall be deemed to comply with ORS 197.732 and Goal 2, Part II."

(Emphasis added.) If a subregional need cannot be reasonably accommodated on lands within the existing UGB on lands in or near the subregion, OAR 660-026-0040(2) then provides the priorities that the district must consider for adding land to the UGB. For example, OAR 660-026-0040(2)(a) requires the district to "[f]irst, examine alternative lands outside the existing regional UGB that are near the subregion, and that are within the first priority under ORS 197.298(1)[.]" In sum, the rules allow Metro to determine the regional need for land, allocate that need to designated subregions, and then determine whether additional lands must be added to the UGB by considering whether "the need can be reasonably accommodated on lands currently within the existing regional UGB *that are within or near each subregion*[.]" OAR 660-026-0040(1) (emphasis added).

As we have already discussed, LCDC's position is that the rules do not depart from the legal standard requiring a regional analysis of the Goal 14 factors before amending a UGB because the designation of subregions, the allocation of need to those subregions, and the amendment to the regional UGB are subject to LCDC review. LCDC argues that there are "internal checks to ensure that [the rules] are applied in a way that is consistent with the goals and the statute." In particular, LCDC refers to the findings that a district must make to support its allocation of the regional need. For example, Metro's allocation of the regional need to subregions must be accompanied by findings that explain how the allocation achieves the requirements of Metro's regional framework plan, how the allocation will achieve a greater efficiency of land uses, how the subregional need fits within the regional context, and why each subregion is identified as such and its needs should be viewed in isolation. *See* OAR 660-026-0030(3).

The problem with LCDC's position is that it is possible to violate the legal standard expressed in Goal 14—that is, that changes to the UGB be justified based on the *regional* consideration and application of the locational factors—but still comply with the rules. We understand that the rules require the district to determine the regional need based on the need factors of Goal 14 and then allow the district to allocate that need to subregions if it can justify the allocation. OAR 660-026-0020; OAR 660-026-0030. That portion of the rules is consistent with our decision in *Residents of Rosemont*. The deficiency in the rules, however, is that, in directing a determination of how to accommodate the identified need, the rules do not require regional application of the locational factors but instead limit Metro's consideration of lands that may reasonably accommodate that need to those lands within the existing UGB that are within or near each subregion.[7] *See* OAR 660-026-0040. Although the rules require that the district must justify its allocation of regional need to subregions, the findings that the district must make do not require the region-wide application of the locational factors to accommodate the regional need. Thus, we conclude that the rules depart from the legal standard expressed in Goal 14.

We recognize that Metro's authority extends over a large geographic area and that, for that reason, a need for housing to serve Washington County workers, for example, may not be well served by providing housing in East Multnomah County, thus necessitating a lengthy commute. We do not understand, however, that a regional evaluation of the locational factors in Goal 14 would necessarily prevent the incorporation of land into the UGB near those

---

[7] In addition to any other requirements concerning urbanization, ORS 197.298 requires that a jurisdiction follow certain priorities in adding land to its UGB. Similarly to Goal 14, in applying the ORS 197.298 priorities, it appears that a jurisdiction must examine lands with its entire geographical planning jurisdiction. OAR 660-026-0040 limits the geographic scope of the jurisdiction's inquiry to lands within or near the subregion, contrary to the standard expressed in ORS 197.298. *Compare* ORS 197.298 (providing, in part, that "[f]irst priority is land that is designated urban reserve land under ORS 195.145, rule or metropolitan service district action plan"), *with* OAR 660-026-0040(2)(a) (providing that the district shall first "examine alternative lands outside the existing regional UGB *that are near the subregion*, and that are within the first priority under ORS 197.298(1)" (emphasis added)).

Washington County workplaces. It appears that such a result might be obtained through application of the existing processes applied in a manner that is consistent with Goal 14. Further, we recognize that the adoption and implementation of a policy that allows Metro to accommodate an identified regional need by considering only land within or near a particular subregion may be a sound policy decision. Certainly it is a policy decision that the legislature, and LCDC in its adoption of the goals, is entitled to make. However, such a policy decision must be implemented by appropriate amendments to the pertinent statutes and goals.

On petitions of City of West Linn and City of Portland, OAR 660-026-0000 to 660-026-0040 held invalid; 1000 Friends of Oregon's petition dismissed.